Walter B. BLESSING and Dorothy L. Blessing, h/w

v.

UNITED STATES of America.

Walter J. THOMAS and Anna M. Thomas, h/w

v.

UNITED STATES of America.

Civ. A. Nos. 76–180 and 76–189.

United States District Court, E. D. Pennsylvania.

Feb. 10, 1978.

As Amended April 19, 1978.

Joseph Lurie, Philadelphia, Pa., for plaintiffs.

James P. Klapps, Tort Section, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

These cases, now before us on Rule 12 motions, raise the important question whether a claim is stated against the United States under the Federal Tort Claims Act by a complaint alleging that personal injuries have been sustained by an employee of a private industrial plant as the result of a negligently conducted inspection of the facility by representatives of the Occupational Safety and Health Administration [hereinafter "OSHA"].[1] As far as we can ascertain, this is a question of first impression.

In *Thomas v. United States,* C.A. 76–189, husband-plaintiff [hereinafter "plaintiff"] was injured at his place of employment when a heavy roll of paper was dislodged from its dispenser by the impact of a fork-lift truck's accidental collision with the dispenser. The roll of paper fell on him, causing severe physical injuries, including several broken bones. Plaintiff alleges that the paper dispenser was defective in that the roll of paper was not locked or otherwise securely affixed to the dispenser. He seeks damages from the United States on the grounds that a representative of OSHA had inspected the premises of plaintiff's employer some nine months before the accident, but, due to alleged negligence, had failed to examine the defective paper dispenser itself. As a result, plaintiff alleges, neither he nor his employer were made aware of the dispenser's dangerous design, nor were any safety precautions taken. It is plaintiff's contention that his injuries were therefore caused by the inspector's negligence and that the United States is liable for the injuries so caused.

The allegations in *Blessing v. United States,* C.A. 76–180, are similar to those made in *Thomas.* Husband-plaintiff [hereinafter "plaintiff"] was employed as the operator of a power press. As he worked at the press one day in January 1974, his right hand was crushed, necessitating amputation of his thumb and partial amputation of two other fingers on his right hand. About a year before the accident, an OSHA representative had visited plaintiff's place of employment for purposes of making a safety inspection and determining compliance with OSHA regulations. Plaintiff alleges that the press was operationally unsafe and had been so for several years, but that the OSHA safety inspector negligently failed to examine it. He further alleges that, because the inspector failed to observe the press' hazardous condition, and since the menace that the press constituted was thus never called to the attention of either plaintiff or his employer, no corrective action was taken. Plaintiff concludes, therefore, that the United States is liable for his injuries in that they were directly and proximately caused by the negligence of its agent, the OSHA safety inspector.

Plaintiffs premise the government's liability on the Federal Tort Claims Act [hereinafter "FTCA"], by which the United States has waived, with certain exceptions, *see* 28 U.S.C. § 2680; note 12 *infra* & accompanying text, its traditional sovereign immunity from suit for common law torts committed by its agents. In relevant part, the FTCA provides:

> . . . the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under the circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). Since, as this provision establishes, the FTCA incorporates the tort law of the state in which the allegedly negligent act or omission occurred, and

---

1. OSHA was established pursuant to the Occupational Safety and Health Act of 1970, Pub.L. No.91–596, 84 Stat. 1590 (1970) (codified at 29 U.S.C. §§ 651–678).

since both such acts relevant to these cases occurred in Pennsylvania, plaintiffs' claims depend on Pennsylvania law. Plaintiffs contend that had the inspections herein undertaken by the government instead been undertaken by a private person, under the facts of these two cases Pennsylvania would hold such a private person liable in tort for the plaintiffs' respective injuries. In support of their contention plaintiffs cite *Mays v. Liberty Mutual Ins. Co.,* 323 F.2d 174 (3d Cir. 1963); *Toppi v. United States,* 327 F.Supp. 1277 (E.D.Pa.1971); and *Evans v. Otis Elevator Co.,* 403 Pa. 13, 168 A.2d 573 (1961), each of which is set out and examined in Part III, *infra.*

The United States, on the other hand, contends that the facts alleged in these cases do not give rise to liability under Pennsylvania tort law. It therefore has moved for dismissal under Fed.R.Civ.P. 12(b)(6) for failure to state claims upon which relief can be granted. In addition, the government argues that the inspections at issue were discretionary in nature, implicating the so-called "discretionary function exception" to the FTCA, 28 U.S.C. § 2680(a), under which the United States remains immune from suit for any injuries sustained as a result of the exercise of governmental discretion, whether or not that discretion is exercised negligently or wrongfully. *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1247 (1953). Because the Third Circuit has held the discretionary function exception to be a jurisdictional bar to federal liability, *see* text accompanying note 6 *infra,* we will treat this aspect of each of the government's motions as a motion to dismiss for lack of subject matter jurisdiction under Fed.R. Civ.P. 12(b)(1). If the government prevails

on either of its contentions, therefore, the actions must be dismissed.

In order to place the governmental inspections challenged in these cases in their proper statutory setting, we observe that the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–678 [hereinafter "Act"], was enacted for the purpose of reducing nationwide the number and severity of work-related illnesses and injuries—just the sort of injuries suffered by the plaintiffs in these cases.[2] Recognizing the national scope of the health and safety problem it confronted and the human and economic costs that existing conditions imposed,[3] Congress established a comprehensive program of regulation, research, and education that calls for the cooperation of and assumption of responsibilities by employers, employees, and both federal and state agencies.

As part of the Act's regulatory scheme, the Secretary of Labor, with input from the Secretary of Health, Education and Welfare and other federal agencies, 29 U.S.C. § 669, is to promulgate occupational health and safety standards, *id.* § 665, with which all employers subject to the Act[4] are to comply, *id.* § 654(a)(2). As a means of monitoring compliance with the Secretary's promulgated standards as well as with the more general statutory requirement that "[e]ach employer—shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees," *id.* § 654(a)(1), the Act authorizes representatives of the Secretary of Labor to enter, at reasonable times, any place of employment covered by the Act, to

---

**2.** 29 U.S.C. § 651(b) provides: "The Congress declares it to be its purpose and policy . . . to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources . . . ."

**3.** Both the Senate and the House Committee reports on their respective preconference versions of the Occupational Safety and Health Act, S. 2193, 92st Cong., 2d Sess. (1970), and H.R.16785, 91st Cong., 2d Sess. (1970), provide

statistical and narrative background that powerfully illustrates the need for concerted and effective programs to assure safe and healthful workplaces. S.Rep.No.1282, 91st Cong., 2d Sess. 2–5, *reprinted in* [1970] U.S.Code Cong. & Admin.News pp. 5177, 5178–81; H.R.Rep.No. 1291, 91st Cong., 2d Sess. 14–16 (1970).

**4.** The Act excludes from coverage the United States, states, and political subdivisions of states. 29 U.S.C. § 652(5).

inspect all pertinent conditions, and privately to question both employers and employees, *id.* § 657. Enforcement procedures and penalties are established for violations of the Act or the regulations and standards issued by the Secretary of Labor pursuant to it. *Id.* §§ 658–666.

 It is important to note at the outset that plaintiffs in these cases do not claim a private right of action against the United States under the Act itself.[5] Although the Act authorizes the inspections alleged by plaintiffs to have been performed negligently, and although regulations promulgated pursuant to the Act provide some of the specifics for such inspections, *see* 29 CFR §§ 1903.1–.12 (1976), neither the regulations nor the statute is at the heart of the present actions. Rather, plaintiffs' claims center on principles of common law tort, made applicable to claims against the United States by the FTCA, whereby one is rendered liable to another for breach of a duty voluntarily assumed by affirmative conduct, even when that assumption of duty is gratuitous. *See* Restatement (Second) of Torts §§ 323, 324A (1965). Succinctly put, it is their contention that, having undertaken to make particular inspections pursuant to the Occupational Safety and Health Act, the government assumed a duty to plaintiffs not to conduct those inspections negligently. Plaintiffs further contend that the government breached its duty to them by its allegedly negligent inspections and that it therefore became liable for the injuries that they subsequently suffered.

Thus, the only private right of action against the United States for negligent or improper enforcement contained in a version of the Act approved by either House was deleted before final passage. In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court articulated four factors for courts to consider in determining whether private rights of action are implicit in statutes that do not expressly provide for such actions. 422 U.S. at 78, 95 S.Ct. 2080.' One of the enumerated factors is whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one." *Id.* Although the particular facts and holding of *Ash* might be more directly applicable to an asserted right of action under the Occupational Safety and Health Act by an employee against his employer rather than against the government, as guidelines for statutory construction the *Ash* principles are, of course, apposite here. Even without consideration of the three remaining *Ash* factors, we find that the Act's legislative history would preclude the argument that a private remedy against the United States is implicit in the statute. Further, the United States is immune from suit unless Congress waives that immunity, *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1247 (1953), and that waiver must be express rather than merely implied, *Acker v. United States,* 226 F.2d 575 (5th Cir. 1955), *cert. denied,* 350 U.S. 1008, 76 S.Ct. 654, 100 L.Ed. 870 (1956); *Malman v. United States,* 207 F.2d 87 (2d Cir. 1953). There is no express waiver in the Act. If plaintiffs are to sue the government, they must, as they quite properly have attempted here, rely on another theory.

5. Nor could they viably do so. To be sure, employees do have an enforcement role under the Act. They are granted procedures whereby they may request inspections by OSHA, 29 U.S.C. § 657(f)(1), report violations of the Act, *id.* § 657(f)(2), participate in inspections, *id.* § 657(a)(2), have a representative accompany inspectors, *id.* § 657(e), have input into modification of any citations issued to their employer by OSHA, *id.* § 659(c), seek judicial review of agency orders, *id.* § 660(a), and sue for a writ of mandamus to compel the Secretary of Labor to petition district courts to restrain any practices or conditions that pose imminent dangers to employees' health or safety if the Secretary arbitrarily or capriciously fails to seek such an order on his own, *id.* § 662(d). Nowhere along this broad spectrum of opportunities for employee participation in enforcement of the Act, however, does there appear any explicit right of action for damages.

In addition to authorizing the Secretary of Labor to seek judicial restraining orders to enjoin imminent dangers, the House version of the Act, H.R.16785, 91st Cong.2d Sess. (1970), would have permitted the Secretary to issue an order, to remain in effect for up to five days, "prohibiting the employment or presence of any individuals in locations or under conditions where such an imminent danger exists, except to remove it." H.R.16785, § 12(a). Any person injured by an arbitrary or capricious issuance or refusal to issue such an order was given a right of action in the Court of Claims to recover the damages sustained. H.R.16785, § 12(c). In conference, this private right of action in the House bill was deleted. Conf.Rep.No.1765, 92st Cong., 2d Sess., *reprinted in* [1970] U.S. Code Cong. & Admin.News pp. 5228, 5236 (Statement of the Managers on the Part of the House).

The Third Circuit treats the discretionary function exception as jurisdictional.[6] *Griffin v. United States,* 500 F.2d 1059, 1963 (3d Cir. 1974); *Gibson v. United States,* 457 F.2d 1391, 1392 n. 1 (3d Cir. 1972). It has also held that jurisdictional issues must be resolved before other questions may properly be considered. *Pacific Intermountain Express Co. v. Hawaii Plastics Corp.,* 528 F.2d 911, 912 (3d Cir. 1976). Therefore, we first must analyze the application of the discretionary function exception to these cases. Our discussion of the exception will be detailed and liberally footnoted; such treatment is a function of our search through the case law for a standard or a coherent set of principles that might govern. Rather than a seamless web, however, we found the law in this area to be a patchwork quilt. In the footnotes particularly we will detail conflicting approaches various courts have taken in applying the discretionary function exception. Yet despite some apparent judicial randomness, we have found sufficient guidance, especially from the Third Circuit in *Griffin v. United States,* 500 F.2d 1059 (3d Cir. 1974), to tell us that the exception does not create pretrial jurisdictional bars in these cases, at least as the facts are now pleaded. The

government's 12(b)(1) motions will therefore be denied, without prejudice to their later reassertion on fuller records.

As to the 12(b)(6) motions, under Pennsylvania law, as the records now stand plaintiffs have not stated claims upon which relief can be granted. But we have stopped at the brink of dismissal for failure to state claims. In keeping with the spirit of the federal rules, we shall not now enter orders of dismissal; rather, we shall give the parties opportunity for discovery on the issues of jurisdiction (discretionary function) and liability, after which time plaintiffs may file amended complaints appropriately sharpened to be in conformity with the guidelines of this opinion, if they can do so in good faith. If plaintiffs do not amend, the actions will be dismissed for failure to state claims upon which relief can be granted. If they do amend, the government will be free to renew its motions or, with discovery having gone forward, to amend them to include motions for summary judgment under Rule 56.

II. *The Discretionary Function Exception*

The question to which we first turn is whether OSHA inspections are "discretion-

---

**6.** The question whether the discretionary function exception, like the other exceptions to federal liability in tort enumerated in 28 U.S.C. § 2680, is jurisdictional or a defense available to the government is subject to "some dispute." *Griffin v. United States,* 500 F.2d 1059, 1063 (3d Cir. 1974). The majority of courts appears to agree with the Third Circuit that the exclusions from liability are jurisdictional. *See, e. g., Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1247 (1953); *Smith v. United States,* 546 F.2d 872 (10th Cir. 1976); *Morris v. United States,* 521 F.2d 872 (9th Cir. 1975); *Konecny v. United States,* 388 F.2d 59 (8th Cir. 1967); *Tapia v. United States,* 338 F.2d 416 (2d Cir. 1964), *cert. denied,* 380 U.S. 957, 85 S.Ct. 1069, 13 L.Ed.2d 974 (1965); *United States v. Taylor,* 236 F.2d 649 (6th Cir. 1956), *cert. dismissed,* 355 U.S. 801, 78 S.Ct. 6, 2 L.Ed.2d 19 (1957); *McGillic v. United States,* 153 F.Supp. 565 (D.N.D.1957); *United States v. United States Tin Corp.,* 148 F.Supp. 922 (D.Alaska 1957); *Fletcher v. Veterans Admin.,* 103 F.Supp. 654 (E.D.Mich.1952); *Toledo v. United States,* 95 F.Supp. 838 (D.P.R.1951).

Other courts, however, disagree, and appear to consider the exceptions to be defenses,

whether they say so explicitly, *see, e. g., Stewart v. United States,* 199 F.2d 517 (7th Cir. 1952); *Clemente v. United States,* 422 F.Supp. 564 (D.P.R.1976); *Neher v. United States,* 265 F.Supp. 210, 163 (D.Minn.1967); *cf. United States v. Muniz,* 374 U.S. 150, 163, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963), or instead indicate their view implicitly by their disposition of one of the exceptions when it is raised, *see, e. g., Coastwise Packet Co. v. United States,* 398 F.2d 77 (1st Cir.) (affirmed grant of summary judgment for the United States rather than dismissing for want of jurisdiction), *cert. denied,* 393 U.S. 937, 89 S.Ct. 300, 21 L.Ed.2d 274 (1968). Even those courts noted above as seemingly in agreement with the Third Circuit sometimes only speak jurisdictionally while in fact behaving otherwise. *See, Dalehite, supra* (affirmed judgment for United States rather than dismissing for want of jurisdiction); *McGillic, supra* (after trial on the merits, entered judgment for United States, rather than dismissing for want of jurisdiction); *Fletcher, supra* (dismissed for failure to state a claim, rather than for want of jurisdiction).

ary functions" within the meaning of the FTCA. If they are, we are without jurisdiction of these cases by virtue of the FTCA's discretionary function exception, 28 U.S.C. § 2680(a),[7] and must therefore dismiss the actions under Rule 12(b)(1).

Seeking to clarify the issue for us, the government contends that whatever might be the substantive merits of plaintiffs' allegations, the discretionary function exception excludes "from coverage of the [FTCA] claims arising from acts or activities of a regulatory nature." Government Memorandum of Points and Authorities in Support of Motion to Dismiss, No. 76–180, at 18 [hereinafter "Government Memorandum"]. Insofar as the inspections by representatives of OSHA giving rise to the instant suits were "activities of a regulatory nature," the government would therefore have us conclude that the suits are barred by the exception.

The broad implications of the government's contention would, if valid, render any possible negligence in our cases nonactionable, for it cannot be gainsaid that the OSHA inspectors were, while inspecting the plaintiffs' respective places of employment, engaged in regulatory activities. Therefore, under the government's reading of the statute, we would be obliged to dismiss for want of jurisdiction any claims, including these two, brought under the FTCA and in which the bases of the complaints were negligently conducted OSHA inspections.

The government, of course, does not contend that merely because a tort is committed by an agent of a regulatory body while in the course of his employment the tort "arises from" the regulatory activity and therefore may not serve as the basis for suit. Such an interpretation of the discretionary function exception would virtually emasculate the FTCA. Thus, while arguing that an accident resulting from a negligent OSHA inspection is not covered by the FTCA, the government concedes, Government Memorandum, *supra,* at 19–20, that a collision with a regulatory agency's vehicle while that vehicle was engaged in agency business would be covered, even though the sine qua non for both accidents was regulatory activity.[8]

The government distinguishes the two situations by asserting that the latter is a common law tort while the former is an injury arising from regulatory activity. Government Memorandum, *supra,* at 19–20. So phrased, however, such a distinction is little more than a conclusory application of labels, for it does not focus on whatever elements distinguish an actionable common law tort from a nonactionable regulatory activity.[9] This lack of focus becomes im-

---

**7.** 28 U.S.C. § 2680(a) provides:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—
> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

**8.** *See* note 11 *infra.* Thus, for example, if we assume that the motor vehicle collision occurred while an OSHA inspector was negligently driving to an industrial plant where he made an OSHA inspection which also was negligently performed, any accidents resulting from either act of negligence would have been caused by a "negligent or wrongful act or omission of [an] employee of the Government while acting within the scope of his office or employment."

28 U.S.C. § 1346(b). Both accidents, in other words, would be pursuant to and in furtherance of the OSHA's regulatory mission and so, in a broad sense, regulatory.

**9.** There is, of course, an (intuitively) obvious difference between operation of a motor vehicle and industrial safety inspection that would lead to different results in the two cases. Inspection is one of the very regulatory functions the agency was established to perform; operation of a motor vehicle is not. When a common law tort and an agency-justifying regulatory function overlap, therefore, we might find protected discretion. A substantial number of cases, however, all of which are conspicuous by their absence from citation in the government's brief, suggest by their reasoning and result in finding liability in the "regulatory" sphere that even such a narrowed definition of regulatory function does not properly draw the line between an actionable and a nonactionable governmental activity. *See, e. g., Downs v.*

portant for analysis when we note that Pennsylvania apparently recognizes a tort action for negligent inspection under certain circumstances, *see Mays v. Liberty Mutual Ins. Co.,* 323 F.2d 174 (3d Cir. 1963); *Toppi v. United States,* 327 F.Supp. 1277 (E.D.Pa.1971); *Evans v. Otis Elevator Co.,* 403 Pa. 13, 168 A.2d 573 (1961); we then face a situation in which common law tort and regulatory activity coalesce.

The government nevertheless seeks to support its broad proposition by citing to some of the discretionary function exception's legislative history. It calls our attention to early drafts of the FTCA that exempted claims arising from the activities of certain regulatory agencies [10] and notes that when the present § 2680(a) was substituted for these particular exclusions the general legislative intent to exclude regulatory activities apparently remained the same. Thus, a committee memorandum explained the revision by stating that it was "designed to preclude . . . application of the act to a claim against a regulatory agency . . .. Since the language used . . . exempts from the act claims against federal agencies growing out of their regulatory activities, it is not neces-

sary expressly to except such agencies . . by name . . .." Explanatory of Committee Print of H.R.5373, 77th Cong.2d Sess. 8 (1942) (Memorandum for the Use of the Committee on the Judiciary).

To the extent that the government argues that this sampling of the FTCA's legislative history supports its proposition that the discretionary function exception bars *all* claims based upon regulatory activity, we think that the government reads too much into its examples and that the true exclusionary intent of the statute's framers was less sweeping. The Federal Tort Claims Act was enacted as a waiver of federal sovereign immunity designed to provide relief to those injured in their persons or property by common law torts committed by agents of the United States acting within the scope of their employment.[11] *Dalehite v. United States,* 346 U.S. 15, 24–25, 27–28 & n. 17, 73 S.Ct. 956, 97 L.Ed. 1247 (1953). Although giving its general consent to being sued in tort, the government carved out a number of exceptions to its waiver of sovereign immunity. Most of the exceptions are reasonably specific, tied to a particular, recognizable government activi-

United States, 522 F.2d 990 (6th Cir. 1975) (law enforcement); *Griffin v. United States,* 500 F.2d 1059 (3d Cir. 1974) (inspection of vaccine); *Hendry v. United States,* 418 F.2d 774 (2d Cir. 1969) (licensing of ship's officer); *Eastern Air Lines v. Union Trust Co.,* 95 U.S.App.D.C. 189, 221 F.2d 62 (air safety regulation), *aff'd per curiam sub nom. United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955); *Hoffman v. United States,* 398 F.Supp. 530 (E.D.Mich.1975) (air safety regulation); *Duncan v. United States,* 355 F.Supp. 1167 (D.D.C.1973) (medical certification); *Swanner v. United States,* 309 F.Supp. 1183 (M.D.Ala. 1970) (law enforcement).

Moreover, in assessing the government's interpretive suggestion, we cannot but note that the statute itself uses the term "discretionary function" and not "regulatory function." It is, of course, possible that the latter is merely a subclass of the former, as the government apparently would contend. It is also possible, however, and indeed more so on the face of the statute, that what is excepted from tort liability is a *discretionary* regulatory function, just as any other discretionary activity is excepted. But under such a construction, the interpretive key is "discretion," not "regulation." This pos-

sibility would move us directly back to square one: What is "discretion" under the FTCA?

10. *See, e. g.,* H.R.5373, 77th Cong.2d Sess. (1942); H.R.5299 § 303(7), 77th Cong., 1st Sess. (1941); S.2690 § 303(7); 76th Cong., 1st Sess. (1939); H.R.7236, 76th Cong., 1st Sess. (1939).

11. As an example of the type of claim the FTCA was intended to affect, the legislative history commonly referred to injuries caused by negligent operation of government motor vehicles by government employees. *See, e. g., Hearings on H.R.5373 and H.R.6463 Before the House Comm. on the Judiciary,* 77th Cong., 2d Sess. 24 (1942); H.R.Rep.No.1287, 79th Cong., 1st Sess. (1945). Before enactment of the FTCA, relief for such injuries was, for the most part, available only through private congressional bills, a process that was intrusive and distracting for Congress, *see Hearings, supra,* at 40, and cumbersome and not always responsive to the needs of the claimants, *see* Reynolds, *The Discretionary Function Exception of the Federal Tort Claims Act,* 57 Geo.L.J. 81 & n. 5 (1968). By waiving federal immunity from suit and granting the district courts jurisdiction over tort claims, Congress could limit the need for the unwieldly private bill mechanism.

ty, and interpreted without undue difficulty.[12] Not so § 2680(a), which broadly exempts from tort liability the execution in due care of a statute or regulation as well as the exercise or performance, whether or not in due care, of any discretionary function or duty.

■ Read as a whole and with an eye to discerning a policy behind this provision, it seems to us only to articulate a policy of preventing tort actions from becoming a vehicle for judicial interference with decisionmaking that is properly exercised by other branches of the government and of protecting "the Government from liability that would seriously handicap efficient government operations," *United States v. Muniz,* 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963). Statutes, regulations, and discretionary functions, the subject matter of § 2680(a), are, as a rule, manifestations of policy judgments made by the political branches. In our tripartite governmental structure, the courts generally have no substantive part to play in such decisions.[13] Rather, the judiciary confines itself—or, under laws such as the FTCA's discretionary function exception, is confined—to adjudication of facts based on discernible objective standards of law. In the context of tort actions, with which we are here concerned, these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions.[14]

**12.** For example, 28 U.S.C. § 2680(b) excludes "Any claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter," § 2680(f) bars "Any claim for damages caused by the imposition or establishment of a quarantine by the United States," and § 2680(i) prohibits "Any claim for damages caused by the fiscal operations of the Treasury or by the regulation of the monetary system."

**13.** To be sure, the courts may review the decisionmaking process to insure that due process requirements are complied with when, for example, a government project involves the taking of private property, as might be the case when water is retained behind a dam. *See Pumpelly v. Green Bay Co.,* 80 (13 Wall) U.S. 166, 20 L.Ed. 557 (1871). This, however, is far different from reviewing the decision to determine if, as an underlying policy matter, the dam should have been built and the property taken at all. *See* note 14 *infra.* Similarly, it is one thing for the courts to review the legality of a decision under an applicable regulation, statute, or constitutional provision, but quite another for them to review—from a policy perspective—the social, political, or economic underpinnings of the decision.

**14.** The first part of § 2680(a) therefore prohibits tests of the legality of statutes or regulations by tort actions; the second prohibits courts from second-guessing, through the vehicle of tort actions, discretionary decisions made by other government officials. *Dalehite v. United States,* 346 U.S. 15, 33, 73 S.Ct. 956, 97 L.Ed. 1247 (1953). The examples, cited time and again in the legislative history, of exempt activities under § 2680(a) are:

"flood-control or irrigation project[s] where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious, or that the statute or regulation authorizing the project was invalid. [The provision] is also designed to preclude application of the bill to a claim against a regulating agency, such as the Federal Trade Commission or the Securities and Exchange Commission, based upon an alleged abuse of discretionary authority by an officer or employee, whether or not negligence is alleged to have been involved. To take another example, claims based upon an allegedly negligent exercise by the Treasury Department of the blacklisting or freezing powers are also intended to be excepted." H.R.Rep.No.2245, 77th Cong.2d Sess. 10 (1942); S.Rep.No.1196, 77th Cong.2d Sess. 7 (1942); H.R.Rep.No.1287, 79th Cong., 1st Sess. 5–6 (1945). Thus, § 2680(a) was aimed at precluding suit for damages suffered from, for example, flooding caused by water backed up behind a new dam, when the suit would be based only on effects naturally flowing from the decision to implement the project, whether the decision be made by statute, regulation, or exercise of discretion. If an individual suffered property damage not because too much sand was negligently mixed into the concrete used in constructing the dam, resulting in the dam crumbling and his land being flooded, but simply because the dam was constructed at all, his injury would be the result of policy decisions made by executives and/or legislators whose function it is to weigh competing policy considerations—economic, social, political, etc.—and to make decisions based on their evaluation of those relevant considerations. *See* note 13 *supra.*

All of this, of course, is traditional doctrine of separation powers and judicial restraint; little seems added by the formula set out in § 2680(a). But that is just the point, for there is evidence within the FTCA's legislative history that such fundamental separation of powers dogma is precisely what the discretionary function exception was designed to embody. When the present discretionary function exception was substituted for the earlier versions of the FTCA that excepted from the waiver of sovereign immunity specific spheres of federal activity, *see* note 10 *supra* & accompanying text, an Assistant Attorney General explained inclusion of the discretionary function exception in the new draft of the FTCA before the House Committee on the Judiciary by observing that

. . . the cases embraced within [the new] subsection would have been exempted from [the prior] bill by judicial construction. It is not probable that the courts would extend a Tort Claims Act into the realm of the validity of legislation or discretionary administrative action, but H.R.6463 makes this specific.

Hearings on H.R.5373 and 6463 Before the House Committee on the Judiciary. 77th Cong., 2d Sess. 29 (1942) (statement of Francis M. Shea). Thus, subject to glosses imposed by subsequent judicial interpretation, the discretionary function exception seems at first to have been designed simply to incorporate the basic tenets of judicial restraint and proper separation of powers.

Whatever our evaluation of the legislative history of the FTCA and the legislative intent concerning the discretionary function exception, the government nevertheless cites an extensive list of cases which it claims supports its contention that in the context of these actions we should equate discretionary function and regulatory function.[15] Government Memorandum, *supra,* at 21–22. Our own review of the applicable case law, however, leads us to a contrary conclusion.

The case on which the government most heavily relies is the leading case of *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1247 (1953), which contains the Supreme Court's only extended discussion of the discretionary function exception.[16] *Dalehite* was a wrongful death action arising out of a disastrous explosion of ammonium nitrate fertilizer stored in ships in the harbor at Texas City, Texas. Although produced and shipped by private firms, the fertilizer was manufactured and distributed for foreign use according to detailed plans and specifications developed by federal officials and under the over-all control and supervision of the United States. The district court held the United States liable based on findings of governmental negli-

---

**15.** *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1247 (1963) (Coast Guard regulation of shipboard loading of cargo); *Daniel v. United States,* 426 F.2d 281 (5th Cir. 1970) (grant-in-aid highways); *Holmes v. Eddy,* 341 F.2d 477 (4th Cir. 1965) (regulatory activities of the SEC); *Blaber v. United States,* 332 F.2d 629 (2d Cir. 1964) (Atomic Energy Commission safety regulations for handling atomic materials); *Mahler v. United States,* 306 F.2d 713 (3d Cir. 1962) (grant-in-aid highways); *Goddard v. District of Columbia Redevelopment Land Agency,* 109 U.S.App.D.C. 304, 287 F.2d 343 (1961) (housing redevelopment), *cert. denied,* 366 U.S. 910, 81 S.Ct. 1085, 6 L.Ed.2d 235 (1961); *Weinstein v. United States,* 244 F.2d 68 (3d Cir.) (IRS regulations), *cert. denied,* 355 U.S. 368, 78 S.Ct. 116, 2 L.Ed.2d 74 (1957); *Powell v. United States,* 233 F.2d 851 (10th Cir. 1956) (improper issuance of a grazing permit); *Schmidt v. United States,* 198 F.2d 32 (7th Cir. 1952) (investigative activity of the SEC); *Chournos. v. United States,* 193 F.2d 321 (10th

Cir. 1952) (failure to grant a grazing permit), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1074, 96 L.Ed. 1369 (1952); *Magellsen v. F.D.I.C.,* 341 F.Supp. 1031 (D.Mont.1972) (processing of an application for deposit insurance).

**16.** The discretionary function exception has also been mentioned, if not helpfully explicated, in *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 193, 100 L.Ed. 799 (1955) (per curiam) (by implication), *aff'g* 95 U.S.App.D.C. 189, 221 F.2d 62 (1955); *Hatahley v. United States,* 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956); *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). *Cf. Rayonier v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) (illustrative of government action leading to tort liability without raising questions involving discretionary function exception).

gence in the drafting and adoption of the plans for production and export of the highly explosive fertilizer, in particular aspects of the governmentally mandated manufacturing process, and in the United States' failure to police the shipboard loading of the finished product. 346 U.S. at 23–24, 73 S.Ct. 956. In affirming the Fifth Circuit Court of Appeals, which reversed the district court, 197 F.2d 771 (5th Cir. 1952), the Supreme Court did not disturb the trial court's findings of fact. Rather, in a 4–3 decision, the Court held that, even assuming the existence of the asserted acts of negligence, by virtue of the Federal Tort Claims Act's discretionary function exception the facts did not confer jurisdiction of the case on the district court under the FTCA because each of the allegedly negligent acts was discretionary in nature. 346 U.S. at 38–44, 73 S.Ct. 956.

After reviewing the history and policies of the FTCA and the discretionary function exception, the Court endeavored to set out broad guidelines for distinguishing discretionary from nondiscretionary acts.

The "discretion" protected by the section is not that of the judge—a power to decide within the limits of positive rules of law subject to judicial review. It is the discretion of the executive or the administrator to act according to one's judgment of the best course . . . .

. . . . .

It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also

includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

346 U.S. at 34–36, 73 S.Ct. at 967–968 (footnotes omitted). Applying its analysis, the Court determined that the alleged acts of negligence in adopting and instituting the plans and specifications for manufacture and export were committed at the discretionary level of what the Court characterized as a two-tiered scheme of governmental activity:

In short, the alleged "negligence" does not subject the Government to liability. The decisions held culpable were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program.

*Id.* at 42, 73 S.Ct. at 971. Similarly, the asserted failure of the government to regulate more strictly loading and storage procedures was cast as a traditionally legislative type of activity and so found to be "classically within the exception." *Id.* at 43, 73 S.Ct. 956.[17]

Unfortunately, despite the Court's efforts, *Dalehite* seems to have left the meaning of the discretionary function exception somewhat unclear, with the result that lower court decisions since *Dalehite* do not comprise a particularly coherent body of case law.[18] *Compare, e. g., Ashley v. United States,* 215 F.Supp. 39, 45–46 (D.Neb.

---

**17.** A claim that the United States should be held liable for the Coast Guard's failure to fight the harbor fire was disposed of on the grounds that private persons are not ordinarily held liable for such putative torts; firefighting is a uniquely governmental activity. Because federal liability under the FTCA is conditioned on analogous private liability, 28 U.S.C. § 2674, the Court ruled that there could be no federal liability for failure to fight a fire. This theory of governmental nonliability under the FTCA, an echo of the traditional distinction between

governmental and proprietary functions applicable to municipal corporations, has since been rejected by the Court. *See Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *Rayonier Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957).

**18.** If we focus only on the Court's holding in *Dalehite* that the failure to adopt stricter regulations or to regulate more closely loading and storage procedures is a protected discretionary function, *Dalehite* has in fact been followed by

1963) (field decision how to handle a troublesome bear in a national park protected by discretionary function exception), *aff'd*, 326 F.2d 499 (8th Cir. 1964), *with Downs v. United States*, 522 F.2d 990 (6th Cir. 1975) (FBI agent's decision how to handle an airplane hijacking not a protected act of discretion), *and Miller v. United States*, 410 F.Supp. 425 (E.D.Mich.1976) (negligent operation of waterworks protected by discretionary function exception) *with Ingham v.*

Eastern Air Lines, Inc., 373 F.2d 227 (2d Cir.) (negligent operation of airport control tower not a protected act of discretion), *cert. denied*, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967). In part, this confusion may stem from the fact that the Court's planning/operational distinction, instructive as it may be on a theoretical level, can become exceedingly problematic when applied to concrete facts.[19] *See, e. g., Smith v. United States*, 375 F.2d 243, 246 (5th

consistent and uneventful judicial development; the government is not liable for a discretionary decision, made consciously or by inadvertence, not to adopt stricter regulations. *See, e. g., First National Bank v. United States*, 552 F.2d 370 (10th Cir.) (failure to require more complete fungicide labels), *cert. denied*, 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977); *Miller v. United States*, 522 F.2d 386 (6th Cir. 1975) (air safety regulations); *Blaber v. United States*, 332 F.2d 629 (2d Cir. 1964) (safety regulation of independent contractors of AEC); *Weinstein v. United States*, 244 F.2d 68 (3d Cir. 1957) (IRS regulation of operations of alcohol denaturing plants); *Dupree v. United States*, 247 F.2d 819 (3d Cir. 1957) (promulgation of even unconstitutional or unreasonable regulations); *Smith v. United States*, 330 F.Supp. 867, 868–70 (E.D.Mich.1971) (policies and rules regulating training of the National Guard); *Marr v. United States*, 307 F.Supp. 930 (E.D. Okl.1968) (CAB air safety regulations); *Rowe v. United States*, 272 F.Supp. 462 (W.D.Pa. 1964) (air safety regulations); *Kullberg v. United·States*, 271 F.Supp. 788 (W.D.Pa.1964) (air safety regulations). *But cf. White v. Trans World Airlines, Inc.*, 320 F.Supp. 655, 657 (S.D. N.Y.1970) (dicta suggesting U.S. might be held liable if the FAA issued regulations "so inadequate to assure safe flight that supplementary services should have been provided.")

*Weinstein v. United States*, 244 F.2d 68 (3d Cir.), *cert. denied*, 355 U.S. 868, 78 S.Ct. 116, 2 L.Ed.2d 74 (1957), cited by the government in support of its position, is in accord with these cases; that is, *Weinstein* found governmental nonliability on the grounds that promulgation of regulations is a discretionary activity. Since plaintiffs in our cases do not challenge OSHA regulations, *Weinstein* is not helpful to the government here. In *Weinstein*, for protection of the United States' revenue interests, IRS inspectors pursuant to regulation required a distillery to be locked. The resulting buildup of alcohol fumes allegedly contributed to an explosion and fire. Plaintiffs argued that existing regulations were inadequate from a safety perspective, and that better regulations should have been promulgated. Finding *Dalehite* dispositive on this point, the Third Circuit affirmed dismissal. *Id.* at 70–72.

19. Courts, including the Third Circuit, do attempt to utilize the planning/operational mode of analysis. *See, e. g., Mahler v. United States*, 306 F.2d 713 (3d Cir.), *cert. denied*, 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962). The frontier where planning ends and operations begin, however, is seldom sharply marked. Because plans and programs are not often put into effect mechanically, judgments of varying sorts and degrees must be made in taking all but the most reflexive actions. Accordingly, most operations retain some "planning" elements right up to final execution. Programs are adopted, broad-brush plans and specifications endorsed, more detailed approaches and strategies incorporated, alternative details substituted or existing ones modified, more specialized particulars refine the more general as general outlines are applied to specific situations, and so on until the program is completed. *Dalehite* indeed recognized that the "planning" function extends beyond the mere "initiation of programs" and "includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations." 346 U.S. at 35–36, 73 S.Ct. at 968. We know, therefore, that the exception covers more than only the largest and most comprehensive planning decisions. But as is suggested by the foregoing discussion, an expansive reading of "plans, specifications or schedules of operations" could all but obliterate any meaningful distinction between planning and operational government activities. At what point, if any, are programmatic decisions and refinements made at the operational rather than at the planning level?

In our cases, for example, the basic plan for OSHA safety regulation was adopted in the statute itself. That plan was then refined in 29 CFR 1901–1999 (1976 & 1977). These refinements presumably are applied to local situations by local OSHA offices. Each inspection undertaken requires some sort of individualized plan for that particular inspection. Is formulating that plan a planning level activity or is it an operational implementation of the larger plan? Are onsite adjustments in the inspection plan, made to adapt office theory to location realities, plans or operations? How do we know?

Cir.), *cert. denied*, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967); *Dolphin Gardens, Inc. v. United States*, 243 F.Supp. 824, 826 (D.Conn.1965). Further confusion may be added by language in the Court's opinion that could be read to suggest a limited construction of the discretionary function exception [20] even in the face of a specific holding that seems to establish a more expansive view of the exception.[21] Also con-

Thus, when put to the test, it is arguable that a dichotomy based on "planning level" activities is not much more helpful in application than one simply based on "discretion." In any event, the statute itself does not describe exempt activity as "planning level," but as "discretionary."

**20.** For example, the *Dalehite* Court noted that "[t]he decisions held culpable were all . . . more or less important to the practicability of the Government's fertilizer program." 346 U.S. at 42, 73 S.Ct. at 971. Thus, without drawing an inflexible line, the Court seemed to distinguish between decisions more critical to the whole of a government program and those that are less critical, those that would affect only an incidental aspect of a larger undertaking. In terms less tied to the facts of the case before it, the Court also mentioned such factors as the existence or absence of positive rules of law that might make the challenged decision subject to judicial review, *id.* at 34, 73 S.Ct. 956, and the "policy" nature of the judgment made, *id.* at 36, 73 S.Ct. 956.

According primary significance to such factors would focus the inquiry into whether a particular activity was discretionary upon the *nature* of the activity at issue. Contrary to a reading of *Dalehite* that would equate decisionmaking with discretion, *see* note 21 *infra*, such a focus would suggest that decisionmaking is not per se discretionary. Rather than the *existence* of decisionmaking, it is the *nature* of that decisionmaking that is dispositive. Did the decision involve considerations that could affect the very existence or nature of the program, or merely a mechanical detail in its operation? The former decisions are manifestations of more traditionally grounded discretion, for they go to determinations of how the government is to govern, whereas the latter are themselves predicated on those determinations. Did the decision depend on the evaluation of competing policy considerations, or simply the application of established "rules of law"? The former decisions could more properly be said to be truly discretionary, for they are not normally reviewable by judicially cognizable standards, whereas the latter are so reviewable. *See* notes 13 & 14 *supra* & accompanying text.

**21.** One of the central issues in the case was whether federal liability could be based on the alleged negligence of the Army in mandating, for the bags of fertilizer, labels which failed to give proper warning of the highly dangerous nature of the fertilizer. The Court held this decision to be protected by the discretionary function exception. 346 U.S. at 42, 73 S.Ct.

956. Yet, considering the criteria recounted in note 20 *supra*, it is not immediately apparent how the considerations going into the labeling decision were truly critical to the over-all practicability of the program, *see* 346 U.S. at 42, 73 S.Ct. 956, or why the decision depended on such "policy" considerations that it could not properly be reviewed by the courts, *see id.* at 34–36, 73 S.Ct. 956, which after all are experienced in dealing with common law negligence and the duty to warn of hazardous conditions. *But cf. First National Bank v. United States*, 552 F.2d 370, 375–76 (10th Cir.) (Involving agency approval of fungicide label under statutory standard that label must contain statements "necessary and, if complied with, adequate to prevent injury." "To enforce these standards, and give content and meaning to them, the agency was required to make policy judgments in evaluating the adequacy of the labeling." Such judgments were held to be within the exception.), *cert. denied*, 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977).

An interpretation of *Dalehite* that approves an expansive view of the discretionary function exception is buttressed by the Court's selection of pre-*Dalehite* lower court cases that interpreted the discretionary function exception "in conformity" with the *Dalehite* holding "that negligence in policies or plans for authorized governmental activities cannot support damage suits." 346 U.S. at 36 n. 32, 73 S.Ct. at 968. For example, one of the cases approvingly cited in this connection, *id.*, was *Olson v. United States*, 93 F.Supp. 150 (D.N.D.1950), which held that deciding when and how much water to release from a dam was within the exception. In doing so, *Olson* equated "judgment" in the sense of making a conscious decision with "discretion" in the sense it is used in the FTCA. 93 F.Supp. at 152–53 ("*When* flood waters are to be released and *how much* water is to be released certainly calls for the exercise of judgment; in other words, the performance of a discretionary function."). The decisions to build the dam, where to build it, how large a capacity to give it, what areas to flood, etc. all would seem clearly to be covered by the discretionary function exception. *Cf. Coates v. United States*, 181 F.2d 816 (8th Cir. 1950) (changing course of Missouri River). These decisions, however, were not at issue in *Olson*. Rather, the focus was on what might seem to be a much more "operational" type of decision: the decision, on a particular date, to open the flood gates.

Thus, on its facts, *Dalehite* might seem to have rejected a more restrictive view of discre-

tributing may be Supreme Court decisions after *Dalehite*, which, while ostensibly not involving the discretionary function exception at all,[22] arguably limit the expansive reading of *Dalehite*'s interpretation of the exception. *See Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955);[23] *Rayonier Inc. v. United*

tion and to have found exempt discretion in any act involving judgment. Although such an all-encompassing application of the discretionary function exception is indeed a possible lesson of the case, Judge Goldberg has convincingly demonstrated that such an interpretation is untenable:

> The description of a discretionary function in *Dalehite* permits the interpretation that any federal official vested with decision-making power is thereby invested with sufficient discretion for the government to withstand suit when those decisions go awry. Most conscious acts of any person whether he works for the government or not, involve choice. Unless government officials (at no matter what echelon) make their choices by flipping coins, their acts involve discretion in making decisions.
>
> If the Tort Claims Act is to have the corpuscular vitality to cover anything more than automobile accidents . . . the federal courts must reject an absolutist interpretation of *Dalehite* . . . .

*Smith v. United States*, 375 F.2d 243, 246 (5th Cir.), *cert. denied*, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967).

**22.** In *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the government conceded that the governmental activity at issue was, in *Dalehite*'s terms, "operational." 350 U.S. at 64, 76 S.Ct. 122. In *Rayonier Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), the issue was never mentioned or even alluded to in any of the reported decisions of the case. *See* 225 F.2d 642, 649, 650 (9th Cir. 1955), *vacated and remanded*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), *on remand*, 166 F.Supp. 373 (W.D. Wash.1958), *vacated and remanded*, 284 F.2d 326 (9th Cir. 1960), *reh. denied mem.*, 289 F.2d 924 (9th Cir. 1961). Of course, lack of subject matter jurisdiction cannot be conferred on a federal court by a waiver or stipulation of a party. *See, e. g., California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); *Potomac Passengers Ass'n v. Chespeake & O. Ry.*, 171 U.S.App.D.C. 359, 520 F.2d 91 (1975). Therefore, to the extent that the discretionary function exception is jurisdictional, *see note 6 supra* & accompanying text, concessions or silence by the parties should not have precluded the Court from reviewing the issue independently in each of these cases. It is, therefore, appropriate to assume that the court considered the discretionary function exception to be inapplicable to them.

**23.** In *Indian Towing*, a lighthouse operated by the Coast Guard failed due to alleged negligence in inspecting and maintaining the light and electrical connections. Plaintiffs further alleged that the government breached a duty to warn vessels that the lighthouse was inoperative. As a result of the government's alleged negligence, a tugboat towing a barge ran aground, and the barge's cargo was damaged by inpouring sea water. Relying in part on *Dalehite*, the United States Court of Appeals for the Fifth Circuit affirmed the district court, which had dismissed the suit for damages against the United States. 211 F.2d 886 (5th Cir. 1954). In a 5–4 decision, the Supreme Court reversed, rejecting the government's argument that uniquely governmental activities were immune from suit under the FTCA, *see* note 17 *supra*, and applying even to "uniquely governmental functions" the "hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." 350 U.S. at 64–65, 76 S.Ct. at 124. In so doing, the Court seemed to recognize that the government's discretion within the meaning of the FTCA ended somewhere between the initial decision to operate the lighthouse and the failure to maintain it properly.

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance offered by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.

*Id.*, at 69, 76 S.Ct. at 127.

So phrased, the distinction drawn in *Dalehite* between planning and operational level activities as aids to identifying discretionary functions holds up in *Indian Towing*. The negligence alleged by the plaintiffs in *Dalehite* focused on the fertilizer program's plans and specifications, not on the actions of those charged with executing those plans and specifications. In *Indian Towing*, on the other hand, the negligence alleged apparently was in the way the lighthouse was operated and maintained, not in the way it was planned.

Regretably, however, the *Indian Towing* Court never explicated the precise reasons the "operational" label was deemed by it to be properly applied in that case. This may in part have been due to the government's concession of the discretionary function issue. It may also have been partly due to a change in the Court majority from *Dalehite*. (The three dissenters

*States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957).[24]

In order to decide the cases before us, however, we need not resolve whatever tensions may be implicit in *Dalehite* and its progeny. The Third Circuit's word binds us, and in *Griffin v. United States*, 500 F.2d 1059 (3d Cir. 1974), the Third Circuit construed the discretionary function exception in a way that we find to dispose of the

in *Dalehite*, Justice Douglas, who took no part in the *Dalehite* decision, and Chief Justice Warren, who was not on the Court when *Dalehite* was decided, made up the majority in *Indian Towing*. The author of the *Dalehite* opinion, Justice Reed, authored the dissent in *Indian Towing* and took the remaining two members of the *Dalehite* majority (Chief Justice Vinson having died in the interim) with him, along with Justice Clark, who did not participate in *Dalehite*. Thus, no Justice voted with either the majority or the dissent in both cases.) Too sharp a distinction or limitation might have endangered a fragile coalition. In any case, *Dalehite* was cryptically and rather uninformatively distinguished: "The differences between this case and *Dalehite* need not be labored. The governing factors in *Dalehite* sufficiently emerge from the opinion in that case." *Id.* Thus, *Indian Towing* confirms that there is a floor to planning level activities below which the government will be held liable, but it offers little concrete guidance in locating that lower limit.

In one particular aspect, however, *Indian Towing*'s silence is instructive in the cases at bar. Nowhere in the opinion is there any indication that there is anything inherently "discretionary" about a governmental inspection of installations or machinery. The inadequate or omitted inspections of the lighthouse—although for maintenance purposes and not for safety evaluation—was put directly at issue by the plaintiffs. *Id.* at 62, 76 S.Ct. 122. Perhaps because the primary, though not the exclusive, focus was on negligently omitted inspections rather than on negligently performed ones, no attention was given to the question whether the exercise of judgment presumably necessary to conducting even a routine maintenance inspection (*e. g.*, determining whether an electrical connection was adequate or even required examination) was the type of decisionmaking that *Dalehite* considered to be symptomatic of discretion. Similarly unclarified was the status of plans or specifications for making maintenance inspections, perhaps because no such plans existed in the case before the Court. Nevertheless, just as the government was willing to concede the point, apparently the Court was willing to accept the proposition that, as part of the maintenance required by due care, any necessary inspections were operational in nature. Thus, *Dalehite* may have been limited *sub silentio* to the extent that the most expansive reading of it, whereby all exercises of judgment are discretionary regardless of the nature of the decision being made, is rendered less tenable at least by the implications, though not by the explicit language, of *Indian Towing*.

**24.** In *Rayonier*, sparks generated by a railroad engine as it crossed government land ignited fires in highly flammable materials that were, it was alleged, negligently allowed by the government to accumulate near certain tracks; the government had agreed to protect against and suppress fires in the affected area. Further negligence was alleged in the method used by the United States in fighting the fire, particularly in failing to extinguish the fire completely when it was under control and when sufficient men, equipment, and water supplies were available. The fire escaped from control and eventually spread to plaintiffs' property.

The government defended on the basis of the implied "uniquely governmental function" immunity that was rejected in *Indian Towing*. See notes 17 & 23 *supra*. As in *Indian Towing*, the *Rayonier* Court declined to apply any such exception to the FTCA. 352 U.S. at 319–20, 77 S.Ct. 374. This time, however, no mention was made of "operational" or "planning" activities. The Court addressed the issue of governmental immunity only. Having decided that issue against the government, the Court sent the case back to the district court. *Id.* at 320–21, 77 S.Ct. 374.

On its face, since not even the "planning" or "operational" catchwords were used by the Court, *Rayonier* said even less about the discretionary function exception than did *Indian Towing*. What is noteworthy for our purposes, however, is the type of activity for which liability was found, apparently without implicating the discretionary function exception at all. It seems unlikely that firefighting could be performed without some degree of conscious decisionmaking as to the deployment of men and equipment, the most efficient method for combatting the fire, etc. Indeed, the factual description of the relevant firefighting activities, contained in the district court opinion after remand from the Supreme Court, make it clear that at issue was in fact a review, under a standard of ordinary care, of the "decisions" made and actions taken in battling the fire. *Arnhold v. United States*, 166 F.Supp. 373, 378–79, 384–88 (W.D.Wash.1958). Planning how to combat the fire, therefore, was apparently not, in *Dalehite*'s terms, a "planning" activity. Thus, to whatever extent that *Dalehite* equated decisionmaking and the exercise of judgment with discretion, *see* note 21 *supra*, *Rayonier*, like *Indian Towing*, *see* note 23 *supra*, may have implicitly cut back on it.

government's contention as stated. *Griffin* was an action brought against the United States for tragic injuries allegedly sustained when defective live-virus polio vaccine, which the United States, through the Division of Biologic Standards (DBS) of the Department of Health, Education and Welfare, had a duty to inspect, was ingested by the plaintiff. DBS had inspected and approved for release to the public the suspect batch of vaccine. Regulations provided that a vaccine batch was to be approved only if the neurovirulence of the batch test lot did not exceed that of the National Institute of Health "reference strain," 500 F.2d at 1062–63 n. 7, and the regulations further set out five criteria to be considered as evidence of neurovirulence. 42 C.F.R. § 73.114(b)(1)(iii). Plaintiff contended that if the test lot exceeded the reference strain as to any one of the five criteria, DBS was to reject the batch. DBS, on the other hand, interpreted the regulations in a way that would permit it to weigh the criteria according to its evaluation of how accurately each criterion reflected neurovirulence. Although the *Griffin* court accepted DBS' interpretation of the rule, which allowed DBS legally to exercise its judgment in the weight to be accorded each criterion in determining whether to reject a batch of vaccine, the court nonetheless held that, despite DBS' permissible regulatory exercise of professional or scientific judgment, the government was liable under the FTCA if that judgment were exercised negligently. 500 F.2d at 1066. Such judgment was found not to be the type of discretion the discretionary function exception was aimed at protecting. *Id.*[25]

■ In steering between the Scylla of judicial overreaching and the Charybdis of judicial abdication as it applied the discretionary function exception to the regulatory situation before it, the *Griffin* court plainly rejected for this circuit the short-answer litmus test of "regulatory activity" that the government would have us adopt. The government activities challenged in *Griffin* manifestly arose out of regulatory activity; i. e., they arose directly out of DBS' mandate to inspect live-virus polio vaccine and to prevent distribution of any vaccine that was excessively neurovirulent. The mere fact of the activity's regulatory nature, however, was insufficient to insulate the agency's negligence; so too was the fact that the activity involved a regulatory inspection and an exercise of judgment. Therefore, the government's argument for dismissal, insofar as it rests on the mere fact that the OSHA inspectors were engaged in regulatory activity, must be rejected on the authority of *Griffin*.

■ Of course, such a conclusion does not necessarily resolve these cases. That some regulatory activity is nondiscretionary most assuredly does not mean that none is. Analyzing the nature of the discretion left immune to private tort claims by the discretionary function exception, the *Griffin* court focused on the Supreme Court's language in *Dalehite* that located protected discretion "[w]here there is room for *policy*

---

**25.** Alternatively, the Third Circuit said that even if the scientific judgment made in determining neurovirulence were discretionary, DBS introduced the concept of "biological variation" into its assessment of neurovirulence without authority to do so under applicable regulations. The court explained that

[t]he concept of 'biological variation' is premised on the fact that a group of similar subjects will respond differently to a single stimulus. The variation in response is due not to variations in the stimulus but rather to differences in the subjects. . . . The effect of relying on 'biological variation' was to discount, or regard as not significant, what otherwise appeared to be excessive neurovirulence.

500 F.2d at 1067–68. In exceeding its authority by unauthorized reliance on biological variation, DBS forfeited whatever protection it might otherwise have had under the discretionary function exception because "[t]he violation of a nondiscretionary command takes what otherwise might be characterized as a 'discretionary function' outside the scope of the statutory exception." *Id.* at 1068–69. Compare *Griffin, supra,* at 1067–69 (regulations specifically required rejection of vaccine under facts of case) *with Mahler v. United States,* 306 F.2d 713, 723 (3d Cir.) (no finding that applicable statute specifically required Secretary of Commerce to reject highway plans under circumstances shown), *cert. denied,* 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962).

judgment and decision." *Dalehite, supra,* 346 U.S. at 36, 73 S.Ct. at 968 (emphasis in *Griffin,* 500 F.2d at 1064). The Third Circuit noted that "[t]he decisions held discretionary in *Dalehite* involved, at minimum, some consideration as to the feasibility or practicability of Government programs," 500 F.2d at 1064, and further observed that "[s]uch decisions involved considerations of public policy, calling for a balance of such factors as cost of Government programs against the potential benefit." *Id.* In contrast, the evaluative judgment made by DBS in *Griffin* had no policyweighing components and was much more narrowly circumscribed in terms of programmatic impact.

> The judgment . . . was that of a professional measuring neurovirulence. It was not that of a policy-maker promulgating regulations by balancing competing policy considerations in determining the public interest. Neither was it a policy planning decision nor a determination of the feasibility or practicability of a government program. At issue was a scientific, but not policymaking, determination as to whether each of the criteria listed in the regulation was met and the extent to which each such factor accurately indicated neurovirulence. DBS' responsibility was limited to merely executing the policy judgments of the Surgeon General. It had no authority to formulate new policy in the immunization program.

*Id.* at 1066 (footnotes omitted). When judgments exercised by regulatory agency officials are professional or scientific in nature rather than policy oriented, the *Griffin* court was of the opinion that the courts are "fully capable of scrutinizing the processes and conclusions of the decision-maker by the usual standards applied to cases of professional negligence." *Id.* at 1066–67 (quoting *Griffin v. United States,* 351 F.Supp. 10, 33 (E.D.Pa.1972)). Thus, the critical inquiry for the Third Circuit, as it must be for us, was "not merely whether judgment was exercised but also whether the nature of the judgment called for policy considerations." *Id.* at 1064.

 In the context of the pleadings in these cases, we can conceive of facts, that, if proven at trial, would divest this court of jurisdiction under *Griffin*'s construction of the discretionary function exception, which focuses on policy input as the hallmark of protected discretion.[26] For example, it

---

**26.** The government is quite correct that, after *Dalehite,* the adoption and promulgation of regulations and standards governing particular spheres of activity is generally considered to be discretionary. The *Dalehite* Court described the discretion protected by the discretionary function exception as "the discretion of the executive or the administrator to act according to one's judgment of the best course." 346 U.S. at 34, 73 S.Ct. at 967. *Dalehite* contrasted such judgments with judgments made "within the limits of positive rules of law subject to judicial review." *Id.* Thus, although there may indeed be a legislatively conferred obligation to regulate and to issue regulations designed to achieve certain goals, within that legislative mandate, developing the particulars of regulation in terms of the degree and scope of regulation to be undertaken and the manner of pursuing proper regulation requires policy judgments of the best way to attain government policy objectives. As such, these judgments are also classic examples of *Griffin*'s characterization of protected discretion under the FTCA. *See* 500 F.2d at 1066. Not surprisingly, therefore, the courts have traditionally and correctly found the broad decisions to adopt particular standards or regulations to be unreviewable under tort law and not actionable under the FTCA. *See* note 18 *supra* & cases cited therein. Were the foci of the suits before us the adequacy or propriety of OSHA regulations and standards under which the contested inspections were carried out, we likely would be compelled to dismiss under the discretionary function exception.

Contrary to the government's contentions, however, plaintiffs in these cases do not attack the propriety or sufficiency of the OSHA standards or regulations. Rather, they challenge the performance of specific inspections that were undertaken under (presumably) established standards (the bare pleading records do not reveal them, although discovery well may). In this respect the plaintiffs' claims are analogous to one of the arguments made in *Blaber v. United States,* 332 F.2d 629 (2d Cir. 1964). In *Blaber,* an explosion had killed one employee and injured three others at a laboratory that was engaged to do work for the government under contract with the Atomic Energy Commission. The plaintiffs argued that the AEC was under a statutory duty to institute more rigorous supervision and inspection of the in-

might be shown that noninspection of the allegedly defective equipment was the result of an authorized decision to limit the scope of the inspections due to limitations of manpower, time, or the like.[27] Such decisions establishing priorities would likely be found to be discretionary in nature and

therefore protected from tort liability because enforcement decisions along these lines would involve balancing policy considerations—*e. g.,* given limited resources, whether to conduct spot inspections at many plants or comprehensive inspections at just a few.[28] In *Griffin's* (and *Dale-*

---

*stallation's* operations. The court disposed of this contention for essentially the reasons we have just articulated:

> The AEC may have considerable power to control the activities of private companies through contracts, but when the Commission decides the extent to which it will undertake to supervise the safety procedures of private contractors, it is exercising discretion at one of the highest planning levels.

332 F.2d at 631. As an alternative theory for recovery, the plaintiffs argued that the

> AEC, though perhaps not compelled to oversee safety procedures, nevertheless did voluntarily undertake to do so, and that the [United States] is therefore liable for AEC's negligence in carrying out its undertaking.

*Id.* The plaintiffs lost this argument as well, but not because of the discretionary function exception. The government conceded that *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), *see* note 23 *supra,* established "the principle that a volunteer is liable for negligence in rendering help" in the context of federal liability in tort, but denied the principle's applicability in that case. The dispositive question for the *Blaber* court, therefore, was not one of law under the discretionary function exception, but one of fact: What was the actual extent of the government's undertaking? Noting that "[t]he fact of inspections alone does not establish the extent of the inspector's obligation," *id.* at 631–32, the Second Circuit agreed with the district court's finding that the extent of the undertaking, determined as a factual matter, was insufficient to support liability under the "good Samaritan" doctrine of *Indian Towing. Id.* at 632.

Plaintiffs' contentions in our cases are much like the second of the plaintiffs' contentions in *Blaber.* In reaching our conclusion, however, we must address a further question with which the *Blaber* court was not required to deal because of the procedural posture of the case before it. In *Blaber* there had already been a factual finding that the *extent* of undertaking assumed by the government would not support liability without regard to the *nature* of the undertaking assumed. In our case, since we are bound to determine the jurisdictional issue first, we must initially determine whether, assuming a sufficient extent of undertaking to support liability, that undertaking, as opposed to the *decision to undertake,* is itself a discretionary function.

**27.** Of course, any such "decisions" may in fact have been made by default due to oversight, by caprice, or by other nonpolicy-considering means. Nevertheless, if the decisionmaking was properly *discretionary in nature,* its exercise in any given instance is irrelevant under the discretionary function exception, for the exception protects "the exercise or performance or *the failure to exercise* or perform a discretionary function or duty . . . *whether or not the discretion* involved *be abused.*" 28 U.S.C. § 2680(a) (emphasis added). Thus, although the Administrative Procedure Act permits challenges in court to the validity of agency action that is arbitrary, capricious, or an abuse of discretion, 5 U.S.C. § 706(2)(A), such government actions do not give rise to tort liability under the FTCA. *See, e. g., Myers & Myers, Inc. v. United States Postal Serv.,* 527 F.2d 1252 (2d Cir. 1975); *Scanwell Laboratories, Inc. v. Thomas,* 172 U.S.App.D.C. 281, 521 F.2d 941 (1975), *cert. denied,* 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976); *Kiiskila v. United States,* 466 F.2d 626 (7th Cir. 1972).

**28.** Accordingly, the courts are generally in agreement that decisions of how best to enforce a regulation or statute are discretionary functions because of the policy factors that go into making such decisions. For example, the *quintessential enforcement agencies* are the various criminal law enforcement entities of government. Decisions such as whether, when, and how to prosecute are usually held to be within the scope of the discretionary function exception despite the general duty to maintain law and order. *See, e. g., Redmond v. United States,* 518 F.2d 811 (7th Cir. 1975); *Accardi v. United States,* 435 F.2d 1239 (3d Cir. 1970); *Smith v. United States,* 375 F.2d 243 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967); *United States v. Faneca,* 332 F.2d 872 (5th Cir. 1964), *cert. denied,* 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965); *Brooks v. United States,* 152 F.Supp. 535 (S.D.N.Y.1957).

A different result obtains, however, when the decision that is challenged by tort action is not allegedly negligent formulation of enforcement policy, but negligent execution of it. Thus, when FBI agents fired at a hijacked plane's tires and engines in an effort to disable it, the Sixth Circuit declined to raise the protective umbrella of the discretionary function exception over the agents' handling of the incident.

*hite*'s) terms, these sorts of decisions would directly affect the feasibility or practicability of the government's inspection program, for without the authority to set priorities the OSHA safety inspection program well might be crushed by the total weight of the task assigned to it. Judicial intervention in such decisionmaking through the vehicle of private tort suits would involve the courts in political, economic, and social decisions in apparent violation of the separation of powers principle that we perceive the discretionary function exception statutorily to embody.[29] Further, precisely because these

*Downs v. United States,* 522 F.2d 990 (6th Cir. 1975). The court conceded that the situation called for the exercise of judgment by law enforcement personnel, but, finding that the discretionary function exception protects only decisionmaking laden with policy considerations, 552 F.2d at 997, refused to apply the exception to the case before it. The court noted that hijacking policy and guidelines had already been set by the appropriate agencies, *id.,* and so the scope of authority of the agents on the scene was simply to execute that policy. If they did so negligently, the Sixth Circuit was of the opinion that the FTCA permitted suit. *See also Swanner v. United States,* 309 F.Supp. 1183 (M.D.Ala.1970) (discretionary function exception does not prevent suit under FTCA for negligent failure to protect informant after decision to investigate and prosecute had already been made).

Cases involving regulatory activity seem to display the same characteristics just noted in criminal law enforcement cases. When policy considerations extend into regulatory enforcement judgments, the cases hold the judgments to be protected acts of discretion with notable consistency. For example, in a suit under the FTCA for damages allegedly caused by the NLRB's delay in securing compliance with reinstatement orders, the Fifth Circuit found that the agency's allocation of its enforcement caseload was a nonactionable discretionary function, for it involved "public policy considerations—balancing of various cost-benefit considerations to advance the public interest." *J. H. Rutter Rex Mfg. Co. v. United States,* 515 F.2d 97, 99 (5th Cir. 1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 359 (1976). The court, however, carefully noted the limitations on protected regulatory discretion:

> The cases following *Dalehite* make clear that an absolutist interpretation of the discretionary function is improper. It is not sufficient for the government to demonstrate that some choice was involved in the decisionmaking process. That showing could be made in almost every case. The nature of the judgment must also call for the balancing of policy considerations.

*Id.* (citations omitted). Similarly, in *Gercey v. United States,* 409 F.Supp. 946 (D.R.I.), *aff'd.,* 540 F.2d 536 (1st Cir. 1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977), parents of a boy who died when the boat from which he was fishing sank sued the government for alleged negligence by the Coast Guard in performance of its certification and inspection duties. The boat had been decertified by the Coast Guard as unsafe, but no follow-up enforcement procedures had been instituted to ensure that the boat did not continue to take passengers to sea. The court held that the regulatory activity challenged was discretionary because of the activity's particular attributes.

> Even if the Coast Guard were under an absolute duty . . . to enforce affirmatively the inspection statutes, the Coast Guard's choice of means by which to carry out that duty would be a completely discretionary, policy-making decision, and governmental agencies are generally free from liability resulting from such decisions.

409 F.Supp. at 953. *See also Kiiskila v. United States,* 466 F.2d 626 (7th Cir. 1972) (security exclusion from army base); *Holmes v. Eddy,* 341 F.2d 477 (4th Cir.) (SEC investigation), *cert. denied,* 382 U.S. 892, 86 S.Ct. 185, 15 L.Ed.2d 149 (1965); *Goddard v. District of Columbia Redevelop. Land Agency,* 109 U.S.App. D.C. 304, 287 F.2d 343 (institution and prosecution of condemnation proceedings), *cert. denied,* 366 U.S. 910, 81 S.Ct. 1085, 6 L.Ed.2d 235 (1961); *Schmidt v. United States,* 198 F.2d 32 (7th Cir.) (SEC investigation), *cert. denied,* 344 U.S. 896, 73 S.Ct. 276, 97 L.Ed. 693 (1952); *Matveychuk v. United States,* 195 F.2d 613 (2d Cir.) (OPA denial of rent increase), *cert. denied,* 344 U.S. 845, 73 S.Ct. 61, 97 L.Ed. 657 (1952); *Harvey v. United States,* C.A. 73–1869 (E.D.Pa. March 19, 1976) (failure to monitor helicopter repair station).

**29.** *See* notes 13–14 *supra* & accompanying text. Such concerns with separation of powers and the proper role of the judiciary were forcefully expressed by Judge Goldberg in *Smith v. United States,* 375 F.2d 243 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967), a case in which the court declined, in light of the discretionary function exception, to apply the FTCA to an exercise of prosecutorial discretion by law enforcement personnel.

> The federal government's decisions concerning enforcement of its criminal statutes comprise a part of its pursuit of national policy. If the government could be held liable for prosecuting or failing to prosecute such a case, its choices in this area could quite conceivably be affected by such a suit. Thus, a policy decision of the federal government might be influenced by a plaintiff with no governmental responsibility.

decisions would require consideration of factors that are primarily political, social, and economic in nature, they, unlike the professional evaluative judgments chal-

We emphasize that this discretion, exercised in even the lowliest and least consequential cases, affect the policies, duties, and success of a function placed under the control of the Attorney General by our Constitution and statutes. . . .

We therefore hold that § 2680(a) exempts the government from liability for exercising the discretion inherent in the prosecutorial function of the Attorney General, no matter whether those decisions are made during the investigation or prosecution of offenses. Another holding could diffuse the government's control over policies committed to it by the Constitution, and irrationally concentrate political responsibility in fortuitous lawsuits.

Whatever else § 2680(a) may do, its discretionary function exception prevents this diffusion of governmental power into private hands. The United States is immune from liability in the present case not because of the mere fact that government officials made choices, but because the choices made affected the political (not merely the monetary) interests of the nation. The Act is intended to spread monetary losses in certain cases among the taxpayers; it is not intended to affect the distribution of political responsibility.

375 F.2d 247–48 (citations omitted).

In view of such considerations, attention to whether a regulatory decision affects the "feasibility or practicability" of a government program is helpful to a policy-oriented analysis of discretion. Our judicial solicitude for individuals hurt by the negligent execution of policy decisions must not lead us to interpose ourselves into the very formulation of governmental policy. The broader and more fundamental the considerations underlaying a challenged decision are within the context of a particular program or undertaking, the more likely it is that judicial intervention will interfere with decisions properly the policy domain of the political branches. On the other hand, when a decision is relatively incidental to larger, more programmatic concerns, the danger of the judiciary impacting on the very "feasibility or practicability" of a government program is minimized.

Of course, some areas of governmental activity are, by their very nature, likely to involve policy-weighing and so will be found discretionary almost as a routine. Promulgation of regulations is one such area. See notes 18 & 26 supra. Another is foreign affairs. Indeed, such matters often are found to be so unreviewable as to be nonjusticiable political questions, much less not amenable to a suit for damages. See, e. g., Mitchell v. Laird, 159 U.S.App.D.C. 344, 488 F.2d 611 (1973); Holtzman v. Schlesinger, 484 F.2d 1307 (2d Cir.), cert. denied, 416 U.S. 936, 94 S.Ct. 1935, 40

L.Ed.2d 286 (1973). Thus, in Four Star Aviation, Inc. v. United States, 409 F.2d 292 (5th Cir. 1969), in which the plaintiff sued the United States for allegedly authorizing the return of an airplane owned by plaintiff to Venezuelan authorities, the court found that, even had the State Department directed the plane's return,

[s]uch decision would have involved the exercise of judgment and discretion with respect to a matter involving our international relations and affecting our foreign policy, and the Federal Tort Claims Act would not have applied thereto.

409 F.2d at 295. A similar hands off policy obtains in the area of awarding government contracts, for even though the lowest bidder that complies with bid requirements may have a prima facie claim on the contract, discretion in enforcing or waiving certain requirements and balancing policy factors may change the result and at the same time insulate that result from tort liability. See, e. g., Myers & Myers, Inc. v. United States Postal Serv., 527 F.2d 1252 (2d Cir. 1975); Scanwell Laboratories, Inc. v. Thomas, 172 U.S.App.D.C. 281, 521 F.2d 941 (1975), cert. denied, 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976); Gowdy v. United States, 412 F.2d 525 (6th Cir.), cert. denied, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969); Lipka v. United States, 249 F.Supp. 213 (N.D.N.Y.1965), aff'd on other grounds, 369 F.2d 288 (2d Cir. 1966), cert. denied, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 997 (1967). But cf. Brown v. United States, 374 F.Supp. 723 (E.D. Ark.1974) (contracting with local political subdivision for confinement of federal prisoners in local jail not discretionary function when statute imposes duty of due care).

Other areas of governmental involvement may require of the courts more careful consideration of policy input and programmatic impact. For example, military activities may sometimes be properly insulated from tort liability by virtue of the discretionary function exception because the activities implicate national security considerations. See e. g., Williams v. United States, 115 F.Supp. 386 (N.D. Fla.1953), aff'd on other grounds, 218 F.2d 473 (5th Cir. 1955). That, however, does not mean that all judgmental activities of a military nature are so protected, any more than that some activities of a regulatory nature are discretionary means that all such activities are. To be sure, there are cases that at least on their face seem to have undertaken no deeper analysis than to note that a military exercise of judgment was involved. See, e. g. Barroll v. United States, 135 F.Supp. 441 (D.Md.1956) (choice of where to test cannons). Even when policy input is not explicitly mentioned, however, most such cases permit the inference that policy considerations played a role in the military ex-

lenged in *Griffin,* would not be the type of determinations that the courts are "fully

ercise of judgment. *Compare, e. g., Bulloch v. United States,* 133 F.Supp. 885 (D.Utah 1955) (the how, when, and manner of nuclear testing is within the discretionary function exception) *with Bartholomae Corp. v. United States,* 135 F.Supp. 651, 654 (S.D.Cal.1955) (nuclear testing; "Here we have a program authorized at the very highest level of Government, to be carried out for the public benefit with important decisions to be made all through the preparation until the final detonation."), *aff'd on other grounds,* 253 F.2d 716 (9th Cir. 1957), *and Huslander v. United States,* 234 F.Supp. 1004, 1007 (W.D.N.Y.1964) (sonic boom caused by supersonic flight; "In this area, directly involving national security, it, of course, is not surprising that policy judgment and decision reach those lower levels of command which bear a heavy responsibility.") *with Ward v. United States,* 471 F.2d 667 (3d Cir. 1973) (planning level decision to order supersonic flight is protected, but operational negligence resulting in sonic boom is not); *Abraham v. United States,* 465 F.2d 881 (5th Cir. 1972) (authorization of supersonic flights resulting in sonic boom protected); *McMurray v. United States,* 286 F.Supp. 701 (W.D.Mo.1968) (authorization of supersonic flights resulting in sonic boom protected); *Schwartz v. United States,* 38 F.R.D. 164 (D.N.D.1965) (authorization of supersonic flights resulting in sonic boom protected). Many of the cases, however, do critically focus on the kind of decision made, with an eye to policy components. *See, e. g., Pigott v. United States,* 451 F.2d 574, 575 (5th Cir. 1971) (test of rocket engine; "We think it clear that the kind of discretion exercised by the government in this case, involving decisions merely as to the day and hour of the firing and the amount of thrust to be developed by the Saturn engines, is insufficient to insulate the defendant . . . through § 2680(a)"); *Huslander v. United States, supra; Swanson v. United States,* 229 F.Supp. 217, 220 (N.D.Cal.1964) (design and installation decisions for tail assembly of military plane not protected by exception; "The operations level decision . . . involves decisions relating to the normal day-by-day operations of the government. Decisions made at this level may involve the exercise of discretion but not the evaluation of policy factors."). In the difficult cases where some policy factors, *e. g.,* economy, may have played a role in the challenged decision, the programmatic breadth or narrowness of the decision has helped the courts reach a decision. *See, e. g., Moyer v. Martin Marietta Corp.,* 481 F.2d 585 (5th Cir. 1973) (design of pilot's ejection seat not protected activity); *Swanson v. United States, supra.* The military nature of the activity is not enough to insulate it when the activity is mere execution of a previously established policy decision. *See, e. g., Ward v. United States, su-*

capable of scrutinizing . . . by the usual standards applied to cases of profes-

*pra; Bulloch v. United States, supra,* at 889 (operational negligence in nuclear detonations might not be protected).

Similar considerations infuse many of the cases involving adoption and design of public works and construction projects. The courts generally find the broad policy decision whether or not to undertake a particular program or project to be a protected activity. *See, e. g., Boston Edison Co. v. Great Lakes Dredge & Dock Co.,* 423 F.2d 891 (1st Cir. 1970) (decision to dredge river); *Konecny v. United States,* 388 F.2d 59 (8th Cir. 1967) (decision to construct dam); *United States v. Gregory,* 300 F.2d 11 (10th Cir. 1962) (decision to remove salt deposits from irrigation canals). When design or specifications of adopted projects are at issue, the necessity of weighing competing policy considerations in reaching a final decision has often resulted in discretionary function protection. *See, e. g., Daniel v. United States,* 426 F.2d 281 (5th Cir. 1970) (per curiam) (decision whether plans for highway meet traffic, safety, durability, and economy of maintenance needs); *Mahler v. United States,* 306 F.2d 713 (3d Cir.) (decision not to reject highway plans), *cert. denied,* 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962); *In re Silver Bridge Disaster Litigation,* 381 F.Supp. 931 (S.D.W.Va.1974) (acceptance of bridge plans). As did *Griffin* in its context, *see* note 30 *infra* & accompanying text, some courts look to reviewability under tort law. *See, e. g., Driscoll v. United States,* 525 F.2d 136, 138 (9th Cir. 1975) (design of traffic crossings at Air Force base held not a protected activity; "Our holding is strongly influenced by our belief that the judicial process is demonstrably capable of evaluating the reasonableness of the failure of the Base Civil Engineer to take the steps that Driscoll alleges were necessary."). As the programmatic scope of the decisionmaking is narrowed, protected discretion is less often found even in design decisions that would appear to have policy components, such as balancing cost against benefit. *See, e. g., Driscoll, supra,* at 138 (design of traffic crossings at Air Force base; "we do not believe that [judicial] evaluation [of the design] will impair the effective administration of the Luke Air Force Base nor will it make the United States liable for large and numerous claims."); *Seaboard Coast Line R.R. v. United States,* 473 F.2d 714 (5th Cir. 1973) (design and specifications of drainage ditch not protected beyond initial decision to build ditch); *American Exchange Bank v. United States,* 257 F.2d 938 (7th Cir. 1958) (decision not to install handrails not protected); *Stanley v. United States,* 347 F.Supp. 1088 (D.Me.1972), *vacated on other grounds,* 476 F.2d 606 (1st Cir. 1973) (decision not to install handrails not protected).

sional negligence." [30] 500 F.2d at 1066–67 (quoting *Griffin v. United States,* 351 F.Supp. 10, 33 (E.D.Pa.1972)). In light of

these considerations, such priority setting would likely be held discretionary under *Griffin.* This would be true at whatever

**30.** The twin foci of policy input and reviewability are complementary aspects of the same concern. The ordinary prudent man standard has little to say about the political, social, or economic desirability of any given government program or the chosen means of pursuing it. *See* notes 13–14 *supra* & accompanying text. Conversely, when, as was the case in *Griffin,* judicially cognizable state tort law standards of due care and reasonableness provide adequate yardsticks for judicial measurement, policy components are more likely to be absent.

In this regard, *Hendry v. United States,* 418 F.2d 774 (2d Cir. 1969), cited by *Griffin,* 500 F.2d at 1066, is instructive. In *Hendry* the Second Circuit held that withholding a ship's officer's license was not protected by the discretionary function exception where the determination that the officer was unfit for duty was based on allegedly negligent psychiatric examinations performed by employees of the U.S. Public Health Service. The government argued that the hybrid medical-administrative decision, involving as it did a regulatory agency, was discretionary. In response, the court undertook an analysis of the type of decisionmaking protected by the discretionary function exception. It pointed to such indicators of discretion as the balancing of factors without reliance on a readily ascertainable rule or standard, 418 F.2d at 782, the level on which the decision was made, *id.* at 783, and whether the decision involved adopting general principles or only applying them, *id.* at 782–83. The court then turned its attention to what it considered to be a primary method of distinguishing protected policy judgments from unprotected professional decisions: reviewability under state tort law.

[S]tate tort standards cannot adequately control those governmental decisions in which, to be effective, the decision-maker must look to considerations of public policy and not merely to established professional standards or to standards of general reasonableness. Of course, the courts may inquire into whether an engineer's judgment in applying the rules of his craft was reasonable, but if the engineer is a government official who must, apart from questions of engineering efficiency and safety, determine whether a particular *program of production is a desirable program,* the courts cannot doubt the reasonableness of his evaluation of the public interest.

. . . . .

[C]omplaints attacking discretionary decisions may frequently raise questions which are political and nonjusticiable in nature, but here the judgments arrived at by the doctors are not different in kind or complexity from

those which courts are accustomed to entertain when tort suits are brought against private physicians. The fact that judgments of government officials occur in areas requiring professional expert evaluation does not necessarily remove those judgments from the examination of courts by classifying them as discretionary functions under the Act.

*Id.* at 783. In effect, the court said that medical malpractice is medical malpractice, and the fact that it was committed by federal officers pursuant to a regulatory activity is insufficient by itself to insulate the government from tort liability under the FTCA.

[T]he statute and regulations governing the delicensing procedure do not appear to convey discretion to identify and consider public safety goals. The only discretion apparently contemplated is that inherent in the judgments of any medical doctor in private practice.

*Id.* Thus, under the *Hendry* analysis, evaluation and pursuit of public safety goals undertaken in a programmatic context is one thing; adherence to professional or scientific norms is altogether another for purposes of the discretionary function exception. *Compare Griffin,* 500 F.2d at 1066 n.16A ("The function of DBS was not . . . to determine whether lots were 'safe for release to the public.' Its specific duty under the regulation was to ascertain whether the neurovirulence standard of the regulation had been met.") *with First National Bank v. United States,* 552 F.2d 370, 375–76 (10th Cir.) (approval of fungicide label under statutory standard that label must contain statements "necessary and, if complied with, adequate to prevent injury"; "To enforce these standards, and give content and meaning to them, the agency was required to make policy judgments in evaluating the adequacy of the labeling."), *cert. denied,* — U.S. —, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977). See also *United States v. DeCamp,* 478 F.2d 1188 (9th Cir. 1973). In *DeCamp,* the Army Corps of Engineers decided not to require safety canopies on bulldozers used by a contractor engaged in removal and disposal of debris. A tree fell and killed a bulldozer operator; the trial court found that the accident would not have occurred had the bulldozer been equipped with a canopy guard. Addressing the discretionary function question, the Ninth Circuit followed *Hendry* in observing that "the decision . . . was not predicated upon considerations of public policy but upon general standards of safety. Accordingly, state tort law can capably measure the reasonableness of the engineer's judgment in applying professional standards of safety." 478 F.2d at 1192.

level the judgments were made, assuming that the officer making the judgment had the authority to make it.[31]

■ Plaintiffs, however, could, consistently with the pleadings, demonstrate that a different hypothetical, under which the jurisdictional bar of the discretionary function exception would be avoided, more accurately reflects the facts of these cases. It is possible that policy decisions were made to inspect the equipment alleged by plaintiffs to have been defective or, at the very least, the instructions under which the inspectors operated might have been such that as a non-policy professional matter it would have been negligent to omit inspections of the equipment. Indeed, it is conceivable that "discretion" was permitted in structuring the inspections, but that it was *professional* discretion; that is, discretion to examine only those things that would be considered, as a professional matter and under objective standards, more likely to cause injury. Such a scenario would be factually analogous to *Griffin*.[32] Failure to inspect

---

**31.** Thus, the *Griffin* analysis focuses on the nature of the judgment rather than merely on the bureaucratic level at which it was made. This does not mean that the level at which a decision was made may not often be a clue as to the presence or absence of protected discretion, *see Hendry v. United States,* 418 F.2d 774, 783 (2d Cir. 1969), but a line or field decision is not necessarily nondiscretionary simply because of the level at which it is made, for such a decision well may contain authorized policy components itself. If, however, applicable regulations or operational standards do not grant such authority to the officer, then a policy-making decision would be in violation of a nondiscretionary command. Such a failure of government officials to act in conformity with delegated authority is not protected by the discretionary function exception. *Griffin,* 500 F.2d at 1068–69. This too would be true at whatever level the decision were made. For example, the decision by DBS in *Griffin* to rely on "biological variation," *see* note 25 *supra,* was surely not made by a technician in the laboratories, but at a higher administrative level in the Bureau of Biologic Standards.

**32.** The question is whether the standards against which the subject matter of the inspection is to be measured permit (or require) balancing competing policy considerations. Similar questions arise when the regulatory function is licensing and certification. When agency certification requires evaluation and application of complex and essentially political policy factors or assessment and balancing of what are for the most part substantively unreviewable considerations of need and qualification, courts routinely find the regulatory activity to be shielded from tort liability. *See, e. g., First National Bank v. United States,* 552 F.2d 370 (10th Cir. 1977) (failure to cancel registration of dangerous fungicide); *Golden Holiday Tours v. Civil Aeronautics Board,* 174 U.S.App.D.C. 292, 294, 531 F.2d 624, 626 n.6 (1976) (arbitrary rejection of amendment to inclusive tour prospectus whereby owner sought to make additional seats available); *Coastwise Packet Co. v. United States,* 398 F.2d 77 (1st Cir.) (allegedly negligent delay by Coast Guard in issuing certificate of inspection), *cert. denied,* 393 U.S. 937, 89 S.Ct. 300, 21 L.Ed.2d 274 (1968); *United States v. Morrell,* 331 F.2d 498 (10th Cir. 1964) (grant of grazing permit); *Dupree v. United States,* 247 F.2d 819 (3d Cir. 1957) (refusal to issue security clearance certification for employment on merchant vessel); *Powell v. United States,* 233 F.2d 851 (10th Cir. 1956) (refusal to grant grazing permits); *Chournos v. United States,* 193 F.2d 321 (10th Cir. 1951) (refusal to grant grazing permit), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1074, 96 L.Ed. 1369 (1952); *Taxay v. United States,* 345 F.Supp. 1284 (D.D.C.1972) (failure to appoint physician as Aviation Medical Examiner under "properly qualified" standard), *aff'd mem.,* 159 U.S.App. D.C. 343, 487 F.2d 1214 (1973); *Magellsen v. Federal Deposit Ins. Corp.,* 341 F.Supp. 1031 (D.Mont.1972) (delay by F.D.I.C. in acting on application for insurance); *Kunzler v. United States,* 208 F.Supp. 79 (D.Utah 1961) (grant of grazing permit), *appeal dismissed,* 307 F.2d 511 (10th Cir. 1962) (per curiam).

On the other hand, when the standards to be applied involve objective and known criteria or require only the exercise of scientific or professional judgments that are reviewable under tort law, the government is not shielded from tort liability by the discretionary function exception. Thus, in *Duncan v. United States,* 355 F.Supp. 1167 (D.D.C.1973), a suit for a negligent denial of a medical certificate, the court found that although setting the standards for certification eligibility is discretionary, "where clear standards are set forth to which are matched the actual individual facts, the courts will hold the judgment to be operational and not discretionary." 355 F.Supp. at 1170. Since under the statute and regulations before the court "any applicant meeting the standards as set forth by the Administrator [had] a legal right to the certificate," *id.* at 1169, and since those standards were clear and objective, the court held the denial to be unprotected by the discretionary function exception. See also *Hendry v. United States,* 418 F.2d 774 (2d Cir. 1969) (discretionary function exception does not protect U.S. for withholding a ship's offi-

the equipment under such circumstances would not have been grounded in an authorized policy decision; review of the noninspection would therefore not affect the programmatic ability of OSHA to structure its inspections according to its evaluation of the "best course," *Dalehite, supra,* at 34, 73 S.Ct. 956, for the decision not to inspect would not have gone to the feasibility or practicability of the program; further, the

omission would be reviewable under judicially manageable tort standards of due care and reasonableness, informed as necessary by expert testimony of scientific or professional norms.[33] Under this latter hypothetical, we do not perceive that *Griffin* would authorize dismissal for want of jurisdiction since judicial review and a judgment of liability, were negligence actually demonstrated, would not intrude on policy judgments made by the political branches.[34]

cer's license on the basis of allegedly negligent psychiatric examination performed by employees of U.S. Public Health Service); *Hoffman v. United States,* 398 F.Supp. 530 (E.D.Mich.1975) (FAA's issuance of certificate, in violation of agency's own regulations setting forth a clear objective standard of CAB economic authority that could be matched against discernible facts, not protected by discretionary function exception); *Pennsylvania R.R. v. United States* 124 F.Supp. 52 (D.N.J.1954) (discretionary function exception inapplicable to negligent failure to determine existence of emergency situation which was only qualification necessary for issuance of permit to use particular pier).

33. The proper focus, therefore, is not on judicial deference to agency expertise. A tort action well may raise difficult and complex issues with which a specialized agency is initially more equipped to deal. Complexity, however, should not by itself be an adequate ground for a finding of exempt discretion. *Hendry, supra,* note 30, at 782. Tort law reviewability looks to the availability of judicially utilizable objective standards of care, not to the self-evidence of such standards.

Medical malpractice cases like Hendry, *supra,* provide an obvious example of situations in which the testimony of professionals is required to establish and to assist in applying the applicable standards of care. The *Griffin* court cited several such cases in support of its proposition that scientific exercise of judgment is not necessarily protected by the discretionary function exception, 500 F.2d at 1066 n.17. The court cited *White v. United States,* 317 F.2d 13 (4th Cir. 1963) (decision to give psychiatric patient freedom of hospital grounds); *Fair v. United States,* 234 F.2d 288 (5th Cir. 1956) (decision to release psychiatric patient); *United States v. Gray,* 199 F.2d 239 (10th Cir. 1952) (decision to leave psychiatric patient unattended); *Costley v. United States,* 181 F.2d 723 (5th Cir. 1950) (administration of paralyzing drug instead of prescribed anesthetic). Other cases to the same effect include: *Supchak v. United States,* 365 F.2d 844 (3d Cir. 1966) (discharge of patient); *Santa v. United States,* 252 F.Supp. 615 (D.P.R.1966) (transfer of heart attack victim to psychiatric hospital); *Hunter v. United States,* 236 F.Supp. 411 (M.D.Tenn.1964) (failure to do incision biopsy when needle biopsy

was unsuccessful); *Friedland v. United States,* 209 F.Supp. 684 (D.Mass.1962) (failure to supervise schizophrenic); *Rufino v. United States,* 126 F.Supp. 132 (S.D.N.Y.1954) (negligent administration of insulin treatment).

On the other hand, there is considerable authority pointing in the opposite direction, especially when the alleged errors in professional judgment involved psychiatric evaluations. *See, e. g., Blitz v. Boog,* 328 F.2d 596 (2d Cir.) (decision to give plaintiff complaining of recurrent fevers psychiatric test), *cert. denied,* 379 U.S. 855, 85 S.Ct. 106, 13 L.Ed.2d 58 (1964); *Smart v. United States,* 207 F.2d 841 (10th Cir. 1953) (failure to supervise psychiatric patient); *Fahey v. United States,* 153 F.Supp. 878 (S.D.N.Y.1957) (psychiatric diagnosis leading to decision not to commit veteran); *Dugan v. United States,* 147 F.Supp. 674 (D.D.C.1956) (decision how to supervise psychiatric patient); *Kendrick v. United States,* 82 F.Supp. 430 (N.D.Ala. 1949) (decision to release psychiatric patient).

34. We note that cases involving air traffic controllers have also declined to extend the protection of the discretionary function exception to professional evaluative judgments. For example, when a CAA traffic controller allegedly gave two planes simultaneous permission to land on the same runway, the court held such an error in judgment to be actionable.

The tower operators acted, and failed to act, at an operational level. While they were in a sense exercising *discretion as to what they* should and should not do, they were not performing the sort of discretionary functions contemplated by § 2680(a) and clearly described in the *Dalehite* decision.

*Eastern Air Lines, Inc. v. Union Trust Co.,* 95 U.S.App.D.C. 189, 205, 221 F.2d 62, 78 *aff'd per curiam sub nom. United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955). Similarly, when an FAA air traffic controller failed to notify an incoming plane of a change in visibility, this failure was held to be actionable although the applicable regulation only required the controller to report "subsequent changes, as necessary"; the professional evaluation of when the report was "necessary" was insufficient to invoke the protection of the discretionary function exception. *Ingham v.*

 Thus, on the basis of the plaintiff's strong hypothetical and our accompanying analysis, we reject without prejudice to its later reassertion on a fuller record, the government's argument based on the discretionary function exception. There is certainly room for operation of the discretionary function exception in this area and perhaps in these very cases, as the hypothetical more favorable to the government illustrates. The problem is that even after briefing and argument we do not know which is the correct hypothetical; we therefore do not know whether we have jurisdiction. In the ordinary case, a jurisdictional issue is usually determinable on the face of the pleadings or with a minimum of discovery. Here, we cannot make the jurisdictional findings without a trial and resultant factual findings. In such a case, it seems that the discretionary function exception actually operates more as an affirmative defense than as a bar to jurisdiction.[35] Bound on this issue by the clear language of the statute on the one hand and the Third Circuit on the other, however, we were constrained first to resolve the discretionary function question as a jurisdictional

matter.[36] Having done so to the extent possible, our resolution can only be that maybe we have jurisdiction and maybe we do not. Insofar as we have treated the governments' motions as ones under Fed.R. Civ.P. 12(b)(1), they must, at least for now, be denied because, as pleaded, plaintiffs' claims would permit development of facts that would not run afoul of the discretionary function exception. *See Supchak v. United States,* 365 F.2d 844 (3d Cir. 1966).

### III. *Dismissal Under 12(b)(6)*

 We turn now to the government's motions under Fed.R.Civ.P. 12(b)(6) to dismiss for failure to state claims upon which relief can be granted. The FTCA makes the United States liable for tortious acts or omissions committed by its agents "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). We therefore must look to the tort law of Pennsylvania to assess the merits of the government's motions, for the allegedly tortious omissions of the OSHA inspectors took place in that state.[37]

*Eastern Air Lines, Inc.,* 373 F.2d 227, 238 (2d Cir. 1967). *See also Dickens v. United States,* 545 F.2d 886 (5th Cir. 1977); *Hartz v. United States,* 387 F.2d 870 (5th Cir. 1968).

35. *See* note 6 *supra.*

36. *See* text accompanying note 6 *supra.* It is irrefutable that the language of the discretionary function exception, as opposed to the exception's functional operation, is jurisdictional. "The provisions of . . . section 1346(b) of this title shall not apply to" discretionary functions. 28 U.S.C. § 2680(a). Section 1346(b) gives district courts jurisdiction over tort suits against the United States. Since the United States is immune from suit unless it has consented to be sued, *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and since jurisdiction to entertain suits against the United States depends on consent to suit, *Rosario v. American Export-Isbrandtsen Lines, Inc.,* 531 F.2d 1227 (3d Cir. 1976), there is no jurisdiction over tort suits if § 1346(b) does not apply.

37. The Government misconstrues the nature and origin of plaintiffs' claims when it states:
The singular thrust of the plaintiffs' asserted cause of action in this case is that the

United States may be held liable for the negligent failure of the Occupational Safety and Health Administration to enforce the statutory or regulatory provisions of OSHA. As such, the source of the duty asserted by plaintiffs arises under federal statute.
Memorandum of Points and Authorities in Support of Motion to Dismiss 6 (No. 76–180) [hereinafter "Memorandum"]. To the extent that the government's argument is that plaintiffs may not bring suit based on a putative private right of action found in the Occupational Safety and Health Act, *see* Memorandum, *supra* at 8–17, we have earlier noted the correctness of this argument, but also have noted its irrelevance to these cases. *See* note 5 *supra* & accompanying text. Insofar as the government's contention is that plaintiffs may not base their claims on alleged breaches of a duty arising solely out of federal law when there is no corresponding duty under state tort law, *see* Memorandum, *supra* at 6–8, the government is once again correct. *See Baker v. F & F Investment Co.,* 489 F.2d 829 (7th Cir. 1973); *Devlin Lumber & Supply Corp. v. United States,* 488 F.2d 88 (4th Cir. 1973) (per curiam); *Davis v. United States,* 395 F.Supp. 793 (D.Neb.1975), *aff'd per curiam,* 536 F.2d 758 (8th Cir. 1976). Plaintiffs' claims, however, are based on al-

■ Pennsylvania recognizes the so-called "good Samaritan" rule, *see generally, e. g.,* Prosser, Handbook of the Law of Torts § 56, at 343–48 (4th ed. 1971), whereby one who undertakes, whether gratuitously or for consideration, to render services to another is held liable for negligent rendering of those services if the negligence causes injury either to the person on whose behalf the services are being performed or to a foreseeable third party.[38] *See, e. g., Pirocchi v. Liberty Mutual Insurance Co.,* 365 F.Supp. 277 (E.D.Pa.1973); *Pascarella v. Kelley,* 378 Pa. 18, 105 A.2d 70 (1954); *Hamil v. Bashline,* 224 Pa.Super. 407, 307 A.2d 57 (1973), *allocatur refused* 224 Pa.Super. xxxvi. This rule is articulated in Restatement (Second) of Torts §§ 323 & 324A (1965),[39] both of which sections have been treated by the courts as correctly stating Pennsylvania law. *See, e. g., Evans v. Liberty Mutual Insurance Co.,* 398 F.2d 665 (3d Cir. 1968) (§§ 323 & 324A); *Toppi v. United States,* 327 F.Supp. 1277 (E.D.Pa.1971) (§ 324A); *Hamil v. Bashline, supra* (§ 323). Further, Pennsylvania courts and federal courts applying Pennsylvania law have applied the rule in the context of inspections allegedly conducted negligently. *See Evans v. Liberty Mutual Insurance Co., supra; Mays v. Liberty Mutual Insurance Co.,* 323 F.2d 174 (3d Cir. 1963); *Evans v. Otis Elevator Co.,* 403 Pa. 13, 168 A.2d 573 (1961). Even more significantly for our purposes, the rule has been applied pursuant to Pennsylvania law under the FTCA to inspections negligently conducted by United States Government inspectors. *See Toppi v. United States, supra.*

Plaintiffs rely heavily on *Evans v. Otis Elevator Co., supra; Mays v. Liberty Mutual Insurance Co., supra,* and *Toppi v. United States, supra,* asserting that, in the context of negligently conducted safety inspections, these cases establish a Pennsylvania good Samaritan rule such that the allegations now before us are sufficient to state claims upon which we could grant relief. Our task is to apply the good Samaritan rule as set out in these and other cases to the facts of the two cases at bar.[40]

leged breaches of duty arising out of Pennsylvania, not federal, law. The Government's argument on this point therefore misses the mark. Because we are concerned here with Pennsylvania law, irrelevant too is the government's discussion of *Davis, supra,* which is only authority for the proposition that under the particular facts and claims asserted in that case, *Nebraska* law recognized no viable action in tort. The relevant question here is whether *Pennsylvania* would recognize this action if the United States were a private person.

**38.** We note that this principle has expressly been made applicable to the United States in suits brought under the FTCA when the relevant state's tort law recognizes it. *See, e. g., Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *Ingham v. Eastern Air Lines, Inc.,* 373 F.2d 227 (2d Cir. 1967); *Armiger v. United States,* 339 F.2d 625, 168 Ct.Cl. 379 (1964).

**39.** Section 323 provides:
*Negligent Performance of Undertaking to Render Services*
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.
Section 324 A provides:
*Liability to Third Person for Negligent Performance of Undertaking*
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
(a) his failure to exercise reasonable care increases the risk of such harm, or
(b) he has undertaken to perform a duty owed by the *other* to the *third person, or*
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

**40.** A case that the government strongly emphasized in oral argument, *Fisher v. United States,* 441 F.2d 1288 (3d Cir. 1971), is inapposite to the facts before us. In *Fisher,* the government owned certain land on which a dam was being constructed. The construction was contracted out by the United States to a general contractor, who in turn subcontracted for certain portions of the work. A new employee of one of the subcontractors was injured on the job, and

■ The foundational requirement of the good Samaritan rule is that in order for liability to be imposed upon the actor, he must specifically have undertaken to per-

form the task that he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative legal duty to perform

sued the United States under the FTCA. Applying Pennsylvania law, the trial court entered judgment against the United States based on findings that the facts of the case made applicable Reinstatement (Second) of Torts § 318. Section 318 provides:

Duty of Possessor of Land or Chattels to Control Conduct of Licensee

If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor

(a) knows or has reason to know that he has the ability to control the third person, and

(b) knows or should know of the necessity and opportunity for exercising such control.

The trial court was of the opinion that § 318 made the United States liable. So constructed, "the very heart of the judgment against the Government [was] the district court's finding that the United States was in possession of the construction site." 441 F.2d at 1290. Some of the evidence upon which the district court based its finding of possession was the at least occasional presence of government inspectors whose job it was to monitor compliance with contract specifications and to issue and enforce safety regulations. On appeal, the Third Circuit held that the district court's finding of possession was clearly erroneous. Since possession was the linchpin of the liability determination, the trial court's judgment was reversed.

The plaintiff in Fisher alternatively relied on a theory of vicarious liability under which he sought to hold the United States liable for the negligence of the subcontractors. Following a long line of precedent, see, e. g., Market Ins. Co. v. United States, 415 F.2d 459 (5th Cir. 1969); Gowdy v. United States, 412 F.2d 525 (6th Cir.), cert. denied, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969); Wright v. United States, 404 F.2d 244 (7th Cir. 1968); Roberson v. United States, 382 F.2d 714 (9th Cir. 1967); Lipka v. United States, 369 F.2d 288 (2d Cir. 1966); United States v. Page, 350 F.2d 28 (10th Cir. 1965); cert. denied 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966); Grogan v. United States, 341 F.2d 39 (6th Cir. 1965), the Third Circuit rejected this theory also, holding "that the United States may not be held liable for injuries to workmen on Government job sites merely because it retains the right, and actually undertakes, to require adherence to safety reg-

ulations and to inspect for compliance with its contract." Id. at 1292. See Gibson v. United States, Nos. 76–2490 & 76–2673, 567 F.2d 1237 (3d Cir. Dec. 15, 1977).

The government asserts that Fisher controls here because of its holding that the mere presence of government inspectors on a job site to monitor compliance with contract specifications and to issue and enforce safety regulations will not create governmental liability in tort. The conceptual focus of Fisher, however, was totally different from that of the instant cases. Although part of the plaintiff's case in Fisher was the contract compliance and safety regulation measures the government instituted at the construction site, these factors were introduced to show possession of land, not to show an undertaking to perform services for another. In our cases, no claim of "possession" by the United States is asserted by plaintiffs, nor is plaintiffs' theory of recovery grounded in vicarious liability; we therefore have no cause to consider the liability of a landowner for the negligent acts of a third party, which was the question Fisher addressed.

The question whether the nature and extent of the government's safety undertaking in Fisher would have been sufficient for "good Samaritan" liability was apparently never raised; it at least was not discussed in the court's opinion. As to both of the theories on which the plaintiff relied—possession of land and vicarious liability—the emphasis of the opinion of the court of appeals was that the presence of government engineers and inspectors was primarily for the government's own purposes in securing contract compliance and was not undertaken on behalf of the contractors or the workers at the construction site. We note that §§ 323 & 324A, the provisions of the Restatement relevant to these cases, initially require that the actor have undertaken to render services to another, which was not the way the issues were framed in Fisher. We therefore do not find Fisher to be an obstacle to plaintiffs in these cases, for it does not address the same questions that now confront us.

We further observe that, at least as the plaintiff's claim was characterized by the Fisher district and circuit courts, the claim was not focused on negligence inspection as such, but more generally on negligent enforcement of applicable safety regulations and reasonable safety precautions. So framed, the plaintiff's claim, had it been brought on a good Samaritan theory, well might have been barred by the discretionary function exception. See generally note 29 supra.

that undertaking carefully. *See generally* Restatement, *supra.* Thus, in Pennsylvania it is established that essential to a finding of liability is a particular undertaking in fact, not merely the expectation of one or the legal right to pursue one. *DeJesus v. Liberty Mutual Insurance Co.,* 423 Pa. 198, 223 A.2d 849 (1966) (per curiam). Further, the extent of an undertaking actually begun is a question of fact, the answer to which determines the scope of the act upon which liability may be premised. *Mays v. Liberty Mutual Insurance Co., supra* at 175–76; *Pirocchi v. Liberty Mutual Insurance Co., supra* at 288. In our view, it is questionable whether under Pennsylvania law plaintiffs have made sufficient allegations of an undertaking to state a claim upon which relief could be granted.

We find *Evans v. Liberty Mutual Insurance Co., supra,* to control this aspect of these cases. In *Evans v. Liberty Mutual,* an employee was injured while attempting to dismantle a machine that cut cardboard boxes. The employer's workmen's compensation insurance carrier had previously made safety inspections of the employer's plant and had made certain safety recommendations based on those inspections. No inspection, however, had been made of the cutting machine, nor had any safety recommendations been made concerning it. The employee therefore sued the insurance carrier for having conducted negligent inspections that resulted in his injuries. Under the facts of the case, including the fact that no inspections were made of the cutting machine, 398 F.2d at 666, the Third Circuit held, *inter alia,* that absent a showing that the insurance carrier had undertaken to make an inspection of the entire plant of the plaintiff's employer, no legal duty owed by the carrier to the employee was established. *Id.* at 667. Since the evidence indicated that only "spot" inspections had been undertaken, the district court, which had directed a verdict for the carrier at the close of the evidence, was affirmed.

■ After *Evans v. Liberty Mutual,* it appears that when an inspector is not under an otherwise enforceable legal or contractual duty to inspect an employer's premises or equipment, an employee can recover for a negligently performed inspection only where the inspector has physically undertaken to inspect (1) the specific instrumentality causing the injury, or (2) the entire physical plant of which the specific instrumentality is a part.[41] This simply follows basic tort law under the good Samaritan rule; duty is measured by undertaking.

■ The pleadings in the two cases before us do not unambiguously satisfy the *Evans v. Liberty Mutual* standard.[42] The

---

**41.** The vitality of the pre–1970 Pennsylvania cases involving inspections by workmen's compensation carriers, including *Evans v. Liberty Mutual,* has been limited by *Brown v. Travelers Insurance Co.,* 434 Pa. 507, 254 A.2d 27 (1969), which held that under Pennsylvania law workmen's compensation carriers share employers' immunity from common law liability and that therefore the carriers are immune from suit by employees for injuries received as a result of negligent inspections or failure to inspect the employer's premises and equipment. *Evans v. Liberty Mutual,* of course, did not reach the immunity issue since the court held that, regardless of any immunity, the plaintiff had not presented sufficient evidence of an undertaking to make an inspection. 398 F.2d at 666. In any event, since our inspections were conducted by OSHA, *Brown* has no relevance to our cases; nor has it anything to say on the issues of extent of the undertaking or causation, which are the only respects in which we cite *Evans v. Liberty Mutual. See* text accompanying note 47 *infra.* In those respects the ratio

decidendi of *Evans v. Liberty Mutual* is still of precedential value.

**42.** The relevant paragraph of the Complaint in *Thomas,* C.A. 76–189, reads as follows:

> 8. On or about April 19, 1973, a representative of the Occupational Safety and Health Administration visited the premises of plaintiff's employer for the purpose of making a safety inspection to determine whether any recognizable hazards existed on the said premises.

As originally filed, the first two counts in *Thomas* sounded in products liability and breach of warranty against the manufacturer of the paper dispenser. The Complaint in *Blessing,* C.A. 76–180, is similar to that in *Thomas,* but adds that the inspection was for the purpose of determining compliance with OSHA regulations:

> 5. On or about January 15, 1973, a representative of the Occupational Safety and Health Administration visited the premises of

pleadings allege only that "a representative of the Occupational Safety and Health Administration visited the premises of plaintiff's employer for the purpose of making a safety inspection to determine whether any recognizable hazards existed on the said premises." Such pleadings might be said to be insufficient to allege either that the OSHA inspectors undertook to inspect the entire plants at which plaintiffs worked or that the inspectors undertook to inspect the particular machines that caused the plaintiffs' injuries. To be sure, the extent of an undertaking is ultimately a question of fact, but at this stage of the proceedings the issue is not one of factual proof, but of factual allegations.[43] Under *Evans v. Liberty Mutual* and its construction of Pennsylvania law, it simply is not enough to claim that a safety inspection was undertaken, for the *extent* of inspection undertaken is critical to liability. In the absence of sufficient allegations of extent, we well might doubt that a claim upon which relief could be granted has been made.

The authorities cited by plaintiffs would not militate against such a conclusion. In *Evans v. Otis Elevator Co.*, 403 Pa. 13, 168 A.2d 573 (1961), an employee injured while riding on a defective elevator at his place of employment sued the defendant elevator company for allegedly having conducted a negligent inspection of the elevator. The elevator company was under contract with the plaintiff's employer to make periodic safety inspections of the elevator, and had in fact done so. The Pennsylvania Supreme Court held Otis liable to the plaintiff for a negligent inspection conducted pursuant to the contract, despite the fact that the employee was not privy to it.

The orbit of Otis' duty to third persons is measured by the nature and scope of his contractual undertaking with Sperling and, if, as presently appears, Otis undertook to inspect the elevator at regular

intervals, and, if the elevator was in a defective or dangerous condition discoverable by reasonable inspection, Otis would be liable to third persons, regardless of any privity of contract, who might be injured by Otis' failure to properly perform its contractual undertaking of inspection.

403 Pa. at 19, 168 A.2d at 576.

An obvious and fundamental difference between *Evans v. Otis Elevator* and the cases before us is the presence in the former case of a contract, which helped define the nature and scope of the undertaking. The court's language suggests that because of the special nature of the contractual undertaking, even had an Otis inspector, in breach of the contract, never in fact looked at the elevator, the *contractual* undertaking nevertheless would have made Otis liable to the plaintiff, despite lack of privity.

Generally a party to a contract does not become liable for a breach thereof to one who is not a party thereto. However, a party to a contract by the very nature of his contractual undertaking may place himself in such a position that the law will impose upon him a duty to perform his contractual undertaking in such manner that third persons—strangers to the contract—will not be injured thereby. It is not the contract *per se* which creates the duty; it is the law which imposes the duty because of the nature of the undertaking *in the contract.*

403 Pa. at 18, 168 A.2d at 575 (citation omitted, emphasis supplied). No contractually defined undertaking is at issue in our cases, however. Nor, as plaintiffs would have us conclude, see Brief of Plaintiffs Contra Defendant's Motion to Dismiss, 76–189, at 7; *Id.*, 76–180, at 7, can the Occupational Safety and Health Act, which authorizes industrial safety inspections, be deemed a surrogate for the contractual definition of the undertaking without running

plaintiff's employer for the purposes of making a safety inspection to determine whether O.S.H.A. Regulations were being complied with and whether any recognizable hazard existed on the said premises.

**43.** Of course, were the allegations that the government negligently failed sufficiently to undertake to inspect, the discretionary function exception might be implicated. *See* notes 29 & 40 *supra.*

directly into the obstacles erected by the protection of agency enforcement of statutes and regulations preserved for the government by the discretionary function exception to the FTCA, *see* note 28 *supra,* and by the lack of a private right of action against the government under the Occupational Safety and Health Act, *see* note 5 *supra.*[44]

Even without consideration of the contractual nature of the undertaking in *Evans v. Otis Elevator,* however, that case is distinguishable from ours. In the former case Otis had in fact physically undertaken the particular inspection of the particular elevator alleged to have been defective. Ignoring the contract, therefore, the case still falls squarely within the parameters of *Evans v. Liberty Mutual,* for the physical undertaking was an inspection of the very instrumentality at issue. In our cases, however, this particularity is lacking.

The same point—particularity—also distinguishes *Toppi v. United States,* 327 F.Supp. 1277 (E.D.Pa.1971). In that case the government supplied inspectors to a private corporation for the purpose of inspecting production and incineration of a certain chemical which was sold to the United States. Due to alleged negligence by these government inspectors, incinerated chemicals exploded, causing injuries to the plaintiff. The plaintiff thereupon sued under the FTCA, relying on Restatement, *supra,* § 324A. A government motion for summary judgment was denied. From the court's opinion in *Toppi,* it appears that the plaintiff there had specifically alleged that the government had undertaken to inspect production of the particular chemical that caused the explosion. This is in sharp contrast to the very general and vague allegations in the cases before us.

It is arguable, however, that plaintiff's pleadings could reasonably be construed more favorably to plaintiffs than was done in the foregoing discussion.[45] Thus, we

---

44. We do not here decide whether claims would be stated under Pennsylvania law were plaintiffs to show the breach of nondiscretionary internal agency orders to inspect either the entire premises of plaintiffs' employers or the allegedly defective equipment. In *Clemente v. United States,* No. 77–1156, 567 F.2d 1140 (1st Cir. Dec. 16, 1977), *see* text at pages 1198–1200, *infra,* the court considered the import of an internal FAA order to perform certain inspections on private aircraft. Chief Judge Coffin, applying the law of Puerto Rico, forcefully reasoned that although such an internal order might have the force of law, the order would not create an enforceable legal duty such that its breach would be negligence per se under state law. (We observe that Pennsylvania recognizes negligence per se for breach of a law or regulation promulgated to protect against the injury suffered, *Miles v. Ryan,* 338 F.Supp. 1065 (E.D.Pa.), *aff'd.,* 484 F.2d 1255 (3d Cir. 1973), when legal causation is shown, *Moore v. Sylvania Elec. Prod., Inc.,* 454 F.2d 81 (3d Cir. 1972); *Kaplan v. Philadelphia Transp. Co.,* 404 Pa. 147, 171 A.2d 166 (1961)). A nondiscretionary instruction from a private employer to a private employee does not ordinarily create an enforceable legal duty running to third parties, and Chief Judge Coffin therefore found that there was no analogous private liability as required by the FTCA, 28 U.S.C. § 1346(b); nor did Chief Judge Coffin think that the presence of governmental sovereignty should make equivalent for tort purposes laws of general application and directives from federal employers to federal employees. Although finding inapplicable the doctrine of negligence per se, Chief Judge Coffin's analysis raised the possibility that such an agency directive might provide a basis for finding an undertaking to render services to another under good Samaritan principles. *Clemente, supra,* at 1145. No reliance was shown in *Clemente,* however, and so recovery was not permitted on this basis either. *Id.* at 1148.

In our cases, plaintiffs do not plead the existence of nondiscretionary agency orders the specific terms of which required inspections of the entire premises or of the allegedly defective equipment; there may well have been none. Therefore, as we have noted, we do not reach the questions whether such orders would be sufficient to create either per se negligence in the event of their breach or a good Samaritan undertaking under Pennsylvania law. We are aware of no Pennsylvania authority on either point. *But cf. Ruddy v. United States Fidelity and Guaranty Co.,* 288 F.Supp. 315 (M.D.Pa. 1968).

45. Plaintiffs might also argue that reading *Evans v. Liberty Mutual* to require specific allegations of an undertaking to inspect the entire premises or the particular machine or place at issue is an improperly restrictive reading of Pennsylvania law. Although *Mays v. Liberty Mutual Ins. Co.,* 323 F.2d 174 (3d Cir. 1963) might be read to support such an argument, we do not so read it. In any case, *Evans v. Liberty Mutual* post-dates *Mays v. Liberty Mutual* and,

might, by emphasizing the word "any," read the pleadings to allege a comprehensive safety inspection designed to uncover any safety hazards found *anywhere* on the premises.

[A] representative of the Occupational Safety and Health Administration visited the premises of plaintiff's employer for the purpose of making a safety inspection to determine whether *any* recognizable hazards existed on the said premises.

*Thomas* Complaint, 76–189, at 5 (emphasis supplied).[46] So construed, the pleading would allege, in accordance with *Evans v. Liberty Mutual,* an undertaking to inspect the *entire* premises. Alternatively, we might read the following pleading altogether disjunctively:

The said inspection was conducted in a negligent fashion in that the said inspector failed to examine and/or call the attention of husband-plaintiff's employer to the hazardous and dangerous condition of the said [equipment].

*Id.*[47] So construed, this pleading would then allege either that the equipment was not inspected *or* that, in accordance with *Evans v. Liberty Mutual,* the OSHA inspector did in fact undertake to inspect the particular equipment but negligently failed to note or report its hazardous condition.

 We, of course, recognize our obligation liberally to construe pleadings in the face of a motion to dismiss. Citing considerable authority, Professor Moore understands the proper standard to be that under the federal rules

a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim. Pleadings are to be liberally construed. Mere vagueness or lack of detail is not ground for a motion to dismiss, but should be attacked by a motion for a more definite statement.

2A Moore's Federal Practice ¶ 12.08, at 2271–85 (2d ed. 1975). The Third Circuit is in apparent accord with this formulation, tending to focus, for purposes of 12(b)(6) dismissals, on the infirmity of claims rather than the mere insufficiency of pleadings.[48] *See, e. g., Miller v. American Telephone & Telegraph Co.,* 507 F.2d 759 (3d Cir. 1974); *Gray v. Creamer,* 465 F.2d 179 (3d Cir. 1972); *Melo-Sonics Corp. v. Cropp,* 342 F.2d 856 (3d Cir. 1965). We further note that in cases, such as the ones before us, in which the courts and litigants confront new and unsettled areas of the law, a clear preference exists for deciding the cases on the merits rather than precipitously disposing of them on the pleadings. *See, e. g., Scott v. Plante,* 532 F.2d 939, 947 (3d Cir. 1976); *Builders Corp. of America v. United States,* 259 F.2d 766, 770–71 (9th Cir. 1958). Therefore, for purposes of the present motions, we shall give the plaintiffs the benefits of our doubts as to the conformity of their pleadings with the *Evans v. Liberty Mutual* criteria and hold that, although they are unfocused and only barely satisfy the Rule

---

insofar as the former clearly requires proof of either specific or comprehensive inspection, would therefore limit it.

**46.** A similar emphasis could be made in the language of the *Blessing* complaint, 76–180. *See* note 42 *supra.*

**47.** The complaint in *Blessing,* 76–180, is comparable, and would permit a similar construction.

6. The said inspection was conducted in a negligent fashion in that the inspector failed to examine, call to the attention of husband-plaintiff's employer the hazardous and dangerous condition of the power press and/or serve citation to the husband's employer for their failure to comply with O.S.H.A. Regulations in maintaining a safe power press and

for maintaining a recognizably hazardous condition on the premises.

**48.** The government's Memorandum of Points and Authorities in Support of Motion to Dismiss does appropriately focus on asserted infirmity in the plaintiff's cause of action, contending that no cognizable claim can exist under the alleged facts. We do not, however, find the arguments advanced in the government's Memorandum persuasive in light of the case law and the legal principles we have discussed. *See* note 37 *supra.* Arguing that *no* cause of action exists under which plaintiffs might recover, the government did not address the specific requirements of §§ 323 & 324A of the Restatement.

8(a)(2) threshold, they are sufficient to survive 12(b)(6) motions.

Even so, the vagueness of the pleadings suggest that plaintiffs would do well to amend them. Indeed, the pleadings will have to be made more specific before pretrial memoranda are filed, for we think it would be improper to go to trial with the cases in such muddled postures. We recognize, however, that the information necessary to enable plaintiffs to amend their complaints properly, if the facts indeed would enable them to do so in good faith and in compliance with Rule 11, may not be in their hands. Therefore, we shall allow a 60 day period for discovery, after which time plaintiffs may amend their complaints more precisely to track the *Evans v. Liberty Mutual* standards.[49] Upon submission of the amended complaints, if any are forthcoming, the government may renew its motions or amend them as motions for summary judgment under Rule 56.

█ We have not yet reached the end of the 12(b)(6) matter, however, for there is a still more serious problem with plaintiffs' complaints; that is, the failure of plaintiffs' pleadings adequately to allege causation under Pennsylvania law and the applicable sections of the Restatement. Sections 323 and 324A [50] of the Restatement provide that physical harm is proximately caused by negligent performance of an undertaking if the negligence increased the risk of harm,

§§ 323(a), 324A(a), or if the harm was suffered because of reliance on the undertaking by the person being served, §§ 323(b), 324A(c), or by a foreseeable third party, § 324A(c).[51] *See Hamil v. Bashline, supra,* 224 Pa.Super. at 414–16, 307 A.2d at 61–62. In addition to premising liability on either of the alternatives of reliance or increased risk of harm—bases for liability shared by § 323 and § 324A—§ 324A states a third possible ground of good Samaritan liability: causation is also shown when the actor's negligence results in injury to a third person, if, in performing a service to another, the actor undertook to perform a duty owed by the other to the third person. Restatement, *supra,* § 324A(b).

█ Addressing first the question of possible causes of action based on § 324A(b), we hold that plaintiffs may not premise liability on the theory that OSHA inspectors undertook to perform duties owed to plaintiffs by plaintiffs' employers. The language of the Restatement suggests that, in order to trigger liability under § 324A(b) in these cases, more is required than a limited functional congruence of OSHA safety inspections conducted pursuant to the Occupational Safety and Health Act, 29 U.S.C. §§ 651–678, and employer safety inspections conducted as part of the employers' common law duty to provide to their employees a safe workplace. That is, the Restatement provision seems to reach

---

**49.** Discovery will be allowed to both parties and will be limited to the issues addressed in this opinion—that is, jurisdiction (discretionary function) and liability.

**50.** Whether § 323 or § 324A is applicable to these cases would depend on whether OSHA inspections were construed to be services undertaken for the benefit of employees, employers, or, perhaps, both. If the inspections were services rendered to employees only, § 323 rather than § 324A would be applicable. The expressed purposes of the Occupational Safety and Health Act, however, might permit a construction that would bring these cases under § 324A as well as § 323. *See* 29 U.S.C. § 651. Cases involving safety inspections of employment premises or production seem to use either § 323, *DeJesus v. Liberty Mutual Ins. Co.,* 423 Pa. 198, 223 A.2d 849 (1966) (per curiam), 324A, *Toppi v. United States,* 327 F.Supp. 1277

(E.D.Pa.1971), or both, *Evans v. Liberty Mutual Ins. Co.,* 398 F.2d 665 (3d Cir. 1968). *But see Clark v. Employers Mutual of Wausau,* 297 F.Supp. 286 (E.D.Pa.1966).

**51.** Pennsylvania courts have construed the provisional requirements of § 323 and § 324A to state the requirements of proximate cause. *See, e. g., DeJesus v. Liberty Mutual Ins. Co.,* 423 Pa. 198, 223 A.2d 849 (1966) (per curiam). Other courts and commentators cite these requirements as elements of the scope of the good Samaritan's *duty* to others. *See, e. g., Clemente v. United States,* 567 F.2d 1140 (1st Cir. 1977). *See generally* Annotation, "Foreseeability as an Element of Negligence and Proximate Cause," 100 ALR2d 942. We here follow the Pennsylvania formulation as we are required to do under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

not the situation in which one undertakes to perform functions coordinate to—or even duplicative of—activities imposed on another by a legal duty, but rather the situation in which one actually undertakes to perform for the other the legal duty itself. Thus, § 324A provides that:

> one who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person . . . is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect [sic] his undertaking, if
>
> . . . . .
>
> (b) he has undertaken to perform a duty owed by the other to the third person . . . . .

Under what would appear to be the fair import of the language of § 324A(b), assuming for present purposes negligent inspections and resultant harm, the United States would be liable to plaintiffs only if by undertaking to make inspections at plaintiffs' workplaces OSHA actually undertook not merely to *supplement* the employers' own safety inspections, but rather to *supplant* those inspections, at least as to those areas and instrumentalities in fact inspected by OSHA inspectors.

The Comment and Illustrations to § 324A(b) confirm what the plain language suggests. The drafters of the Restatement provide as examples situations in which a managing agent takes charge of a building for the owner and agrees to keep it in proper repair, in which a telephone company contracts with another company to inspect its telephone poles, or in which a person is employed to superintend construction work, including inspection of scaffolding erected by a subcontractor. The applicable examples cited in the Appendix to the Restatement are virtually all of like effect. In each of these examples of § 324A(b) liability, the one held liable when he negligently performed his undertaking and injury to a third person resulted had undertaken to perform tasks *on behalf* of another and *in lieu* of that other. In such circumstances, it is logical to impose on the actor the duty of due care that otherwise would rest solely on the person for whom he is acting. When, however, the actor's performance is undertaken independently of any duty or obligation imposed on the other by law, although the actor well may have assumed duties of his own to third persons by operation of such factors as reliance or increased risk of harm, there appears no sound reason why the duties and liabilities of the other should also be imposed on him.

Although we have found no Pennsylvania or Third Circuit cases in which § 324A(b) has been authoritatively construed, those federal courts that have construed it have done so along the lines the foregoing discussion would suggest. See, for example, *Davis v. Liberty Mutual Ins. Co.*, 525 F.2d 1204 (5th Cir. 1976), the most recent in a line of cases out of the Fifth Circuit that has construed § 324A(b). In *Davis*, an employee who was injured at his workplace sued his employer's workmen's compensation carrier for having negligently inspected the corrugating machine that caused his injury. Suit was premised on § 324A. Although the carrier had undertaken to make inspections of the employer's premises, the court found this undertaking insufficient to state a claim under § 324A(b).

> As to subpart (b), despite Davis' argument to the contrary, there is no evidence that Liberty Mutual undertook to perform a duty owed by the employer . . to its employees. As in most states, the law in Alabama is clear that an employer has a legal obligation to provide his employees with a safe place to work. . . Although it is true that on occasions [the employer] requested that Liberty Mutual send representatives to assist in conducting plant inspections and to make recommendations for safety improvements, there is no evidence that [the employer] ever delegated any part of its direct and primary duty to discover unsafe conditions. Rather, it appears that [the employer] used Liberty Mutual for recommendations as an aid to the company in fulfilling its own duty to provide a safe place to work.

525 F.2d at 1207–08. *See also Tillman v. Travelers Indemnity Co.*, 506 F.2d 917, 921 (5th Cir. 1975) (insurer undertook safety inspections, but court refused to impose liability on insurer under § 324A(b) where "the record was void of any indication that the employer had delegated to the insurer any part of its direct and primary duty to discover unsafe conditions"); *Stacy v. Aetna Casualty & Surety Co.*, 484 F.2d 289, 293–94 (5th Cir. 1973) (§ 324A(b) requires that the insurer's undertaking to inspect "amounted to an assumption of a duty of inspection owed by [the employer] to its employees," and where the employer did not delegate to the insurer "either by contract or by a course of conduct, any part of its direct and primary duty to discover unsafe conditions" the necessary "systemwide assumption of [the employer's] duty to discover latent hazards" was not shown).

An instructive comparison to these Fifth Circuit cases is provided by *Hill v. James Walker Memorial Hospital*, 407 F.2d 1036 (4th Cir. 1969), in which the Fourth Circuit imposed liability under § 324A(b). There a hospital had contracted with an exterminating company for the control of rats. The plaintiff was injured when she fell into a bathtub after being frightened by a rat running across her feet. The court found that the hospital had a legal duty to exercise reasonable care for the safety of its patients. Then, in telling contrast to the facts of the Fifth Circuit cases that made § 324A(b) inapplicable, the Fourth Circuit expressly found that the exterminating company "had undertaken to perform a certain aspect of [the hospital's] duty *in the hospital's behalf.*" 407 F.2d at 1042 (emphasis supplied). It is apparent that the *Hill* court employed the same analysis as that used by the Fifth Circuit, but that the nature and extent of the actor's undertaking distinguishes *Hill* from the other cases. That is, only where the actor's undertaking is to perform a duty of another are the liabilities of the other imposed on him. Where the actor's undertaking only parallels the activities required by a duty of another without being an undertaking in substitution for it, § 324A(b) does not apply.

*See also Jeffries v. United States*, 477 F.2d 52, 56 (9th Cir. 1973); *Ruddy v. United States Fidelity and Guaranty Co.*, 288 F.Supp. 315, 318 (M.D.Pa.1968). *But cf. Clark v. Employers Mutual of Wausau*, 297 F.Supp. 286 (E.D.Pa.1969). Of course, without regard to what the actor in fact undertook to do, under some circumstances the other might reasonably perceive the undertaking to be in substitution for his own performance, and so rely on the undertaking to the detriment of a third person. Such a case, however, is properly considered under § 324A(c) of the Restatement (reliance of the other or a third person upon the undertaking) and not under § 324A(b).

We endorse the position suggested by the language of the Restatement, supported by the Illustrations, and heretofore adopted by the courts. Focusing on the facts of these cases in the light most favorable to plaintiffs in order to ascertain whether the OSHA inspections at issue could be undertakings to perform duties owed by plaintiffs' employers to plaintiffs, it is important that the fact that OSHA undertook to make inspections not be evaluated for purposes of § 324A(b) liability without reference to the context provided by the enabling legislation. We have previously set out an overview of the Occupational Safety and Health Act, *see* notes 2–5 *supra* & accompanying text, and will not here repeat ourselves. We think it clear from a reading of the Act that the United States did not, by undertaking to make inspections, undertake on behalf of plaintiffs' employers to perform the duty of inspection owed by the employers to plaintiffs. Indeed, 29 U.S.C. § 654(a)(1) provides:

> Each employer—(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees . . . .

This provision, of course, though now included in a statutory enforcement scheme, is essentially a restatement of the common law duty of employers to employees, and

was apparently understood as such by the proponents of the Act.

Under principles of common law, individuals are obliged to refrain from actions which cause harm to others. Courts often refer to this as a general duty to others. Statutes usually increase but sometimes modify this duty. The committee believes that employers are equally bound by this general and common duty to bring no adverse effects to the life and health of their employees throughout the course of their employment. Employers have primary control of the work environment and should insure that it is safe and healthful. Section 5(a), in providing that employers must furnish employment "which is free from recognized hazards so as to provide safe and healthful working conditions," merely restates that each employer shall furnish this degree of care.

S.Rep.No.1282, 91st Cong., 2d Sess., reprinted in [1970] U.S.Code Cong. & Admin.News, pp. 5177, 5186. *See also* 116 Cong.Rec. 38371, 38382–83 (1970). Thus, rather than purporting to relieve employers of any of their safety duties through the Act and inspections conducted pursuant to it, Congress recognized employer's safety responsibilities in the context of a remedial statute characterized by extensive regulatory and enforcement provisions. Although § 654(a)(1) speaks only of "recognized" hazards and some language in the Senate Report could conceivably be read to suggest that the employers' duty of inspection for previously *unrecognized* hazards had been

assumed by the United States, we think that, in light of the purposes of the Act and the general congressional intent, such an interpretation would be manifestly incorrect.[52] Indeed, § 653(4) of the Act unequivocally supports our view.

> Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or *to enlarge or diminish or affect in any manner the common law* or statutory rights, *duties,* or liabilities *of employers* and employees under any law *with respect to injuries,* diseases, or death of employees *arising out of, or in the course of, employment.* (emphasis supplied)

This section carefully specifies that the Act leaves intact, *inter alia,* the common law duties of employers to their employees.

On the basis of the foregoing, it is clear to us that the United States has not, through OSHA, undertaken to perform any duties of the employer, but rather has undertaken to make inspections that are supplemental to, but independent of, inspections required of employers by their common law duties to their employees. Therefore, § 324A(b) is inapplicable to these cases, and plaintiffs cannot, as a matter of law, state claims upon which relief can be granted under that subsection.

■ Our disposition of these cases must be less conclusive, however, insofar as plaintiffs' claims may be based, not on Restatement § 324A(b), but rather on the alternative grounds of good Samaritan liability set out in Restatement §§ 323 and 324A(a),

---

**52.** Thus, referring to § 654(a)(1), the Senate Report explains:

The general duty clause in this bill would not be a general substitute for reliance on standards, but would simply enable the Secretary to insure the protection of employees who are working under special circumstances for which no standard has yet been adopted. Moreover, the clause merely requires an employer to correct recognized hazards after they have been discovered on inspection and made the subject of an abatement order. There is no penalty for violation of the general duty clause. It is only if the employer refuses to correct the unsafe condition after it has been called to his attention and made

the subject of an abatement order that a penalty can be imposed.

S.Rep.No.1282, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 5177, 5186. It seems to us that the only point of this passage in the Senate Report is that, *for purpose of penalties under the 'Act,* when no applicable standards have been promulgated the employer is bound only to correct hazards that have been discovered and cited by OSHA inspectors. That, of course, says nothing at all about the general common law duty to provide—and inspect to ensure—a safe workplace, which Congress clearly considered to rest on employers even after passage of the Act.

(c)—increased risk of harm or reliance.[53] Plaintiffs' complaints are defective because we can find in the pleadings no allegations that plaintiffs or their employers relied on the OSHA inspections or that the alleged negligence of the OSHA inspectors in any way increased the plaintiffs' risk of harm. The only pleadings that might at all go to causation allege only that "[a]s a result of the negligence" of the OSHA inspectors the plaintiffs sustained certain injuries.[54] Such boilerplate pleadings may provide an adequate allegation of proximate cause for some common law torts, but they would appear to be insufficient under §§ 323 and 324A. Insofar as both of these sections provide that a negligent actor is liable for "physical harm resulting from his failure to exercise reasonable care to perform his undertaking, *if*" the plaintiff or the one to whom the actor undertook to render services relied on the undertaking or "*if*" the negligence increased the plaintiff's risk of harm (emphasis supplied), the language of the Restatement assumes that the injuries somehow factually "result" from the defendant's negligence before it even reaches the issues of reliance of increased risk—questions of legal cause. In other words, that harm "results" from the negligence charged is inadequate under the Restatement unless the harm is caused by increased risk or reliance. Plaintiffs' allegations never get past the "resulting from" language of the Restatement, and so could be said not to address at all the issue of legal cause.

Thus, we do not here have ambiguous pleadings that might conceivably be read to include the necessary allegations, as we did on the issue of extent of the undertaking. Rather, here we have a total failure to include, ambiguously or otherwise, any pleadings reaching the crucial causation factors under §§ 323 and 324A. Because proximate cause is a critical element of a plaintiff's prima facie case in tort, when under § 323 or § 324A the requisite reliance or increased risk of harm does not appear, courts have dismissed, *DeJesus v. Liberty Mutual Insurance Co., supra,* rendered summary judgment, *Clark v. Employers Mutual of Wausau,* 297 F.Supp. 286 (E.D.Pa.1969), or directed verdicts for defendant, *Evans v. Liberty Mutual Insurance Co., supra,* as the case's procedural posture made appropriate. In our cases, the proper resolution would be dismissal, for without an allegation of legal causation, plaintiffs have not stated a claim that would entitle them to relief under Pennsylvania law. *See DeJesus v. Liberty Mutual Insurance Co., supra.*

The case law plaintiffs have presented in support of their position that under the

---

**53.** That the Occupational Safety and Health Act precludes a finding of federal liability under § 324A(b) as a matter of law does not mean that the statute has the same effect on subsection (a) or (c) of § 324A. The latter subsections address the consequences of what a good Samaritan undertook to do; they focus on whether what he did either made matters worse than they were before his involvement (increased the risk of harm) or induced reliance. Subsection (b), on the other hand, is much more addressed to a definition of the undertaking itself; it focuses on whether, independently of any increased risk or induced reliance, the good Samaritan undertook to perform a duty owed by another to a third person. Although the statute tells us what the United States, through OSHA, has undertaken to do, it does not tell us what results flowed from the United States' undertaking.

**54.** The relevant pleadings in *Thomas,* 76–189 are as follows:

10. As a result of the negligence of the duly authorized inspector of the Occupational Health and Safety Administration, the hus-

band-plaintiff sustained the following injuries and damages:

[injuries and damages are listed].

11. As a result of the negligent inspection of the duly authorized employees of the Occupational Safety and Health Administration, wife-plaintiff sustained the following injuries and damages:

[injuries and damages are listed].

The corresponding pleadings in *Blessing,* 76–180, are nearly identical:

7. As a result of the negligence of the duly authorized inspector of the Occupational Health and Safety Administration, husband-plaintiff sustained the following injuries and damages:

[injuries and damages are listed].

8. As a result of the negligence of the duly authorized inspector of the Occupational Health and Safety Administration, wife-plaintiff sustained the following injuries and damages:

[injuries and damages are listed].

circumstances of these cases reliance or increased risk are not necessary components of their causes of action does not persuade us otherwise. *Evans v. Otis Elevator Co.*, 403 Pa. 13, 168 A.2d 573 (1961), *see* text accompanying note 44 *supra*, involved a maintenance contract under which the defendant elevator company specifically contracted to perform the safety inspections and maintenance that otherwise would have been the duty of the plaintiff's employer to perform. Under such circumstances, a finding of liability would have been quite appropriate under § 324A(b) without reference to reliance or increased risk of harm; of course, the Second Restatement of Torts, which included § 324A for the first time, was not yet promulgated when *Otis Elevator* was decided. Because we find § 324A(b) inapplicable to these cases, *see* text accompanying note 52 *supra*, *Otis Elevator* is of no help to plaintiffs. *Adcox v. Pennsylvania Mfrs.' Ass'n Casualty Ins. Co.*, 37 D. & C.2d 157 (Phila.C.P.1964) is only a Common Pleas case and, furthermore, antedates the Second Restatement as well as the Pennsylvania Superior and Supreme Court and Third Circuit cases that require a showing of reliance or increased risk of harm. *See Evans v. Liberty Mutual Ins. Co.*, 398 F.2d 665 (3d Cir. 1968); *DeJesus v. Liberty Mutual Ins. Co.*, 423 Pa. 198, 223 A.2d 849 (1966) (per curiam); *Hamil v. Bashline*, 224 Pa.Super. 497, 307 A.2d 57 (1973), *allocatur refused* 224 Pa.Super. xxxvi. In any case, *Adcox* did not specifically address the particular question with which we are here concerned. For all these reasons, *Adcox* is far from compelling precedent. *Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 199 N.E.2d 769 (1964), is not from Pennsylvania, being a case in which the Illinois Supreme Court construed Florida law. Furthermore, *Nelson* also antedates the Second Restatement and the Pennsylvania cases on which we rely. *Nelson* can hardly be cited as questioning the

analysis and conclusions of cases that, when *Nelson* was written, had not yet been decided. Moreover, the *Nelson* court specifically found that reliance by the employer on the insurer's safety inspections was present, so its digression on the non-necessity of proving reliance is arguably mere dicta. To the extent that, despite the foregoing, *Nelson* can be construed to support plaintiffs' position, we find telling and persuasive the analytical criticisms leveled at the *Nelson* decision by legal commentators. *See, e. g.*, 51 U.Va.L.Rev. 347 (1965); 18 Vand.L.Rev. 1615 (1965).

Although neither reliance nor increased risk are alleged in plaintiffs' complaints and although plaintiffs have not persuaded us that reliance or increased risk of harm are unnecessary to their causes of action, in accordance with our perception, noted at text accompanying note 48 *supra*, of the proper and limited role of 12(b)(6) dismissals, we shall nevertheless decline to dismiss at this stage. It is possible that sufficient legal causation exists under § 323 or § 324A(a) or (c), to entitle plaintiffs to relief, but that the pleadings simply do not properly allege it. Therefore, rather than dismiss, we think the better course is to give the plaintiffs the opportunity to file more specific pleadings by way of amended complaints within 75 days, after engaging (to a limit of 60 days) in whatever proper discovery they consider necessary.[55] *See, e. g., Sarter v. Mays*, 491 F.2d 675, 676 (5th Cir. 1974). If amended pleadings are not forthcoming after this opportunity to amend, we shall dismiss the complaints under Rule 12(b)(6) for failure to allege sufficient legal causation, hence to state claims upon which relief can be granted.

Our determination strictly to require allegations of either reliance or increased risk of harm is supported by the policy and reasoning of *Clemente v. United States*, 567 F.2d 1140 (1st Cir. 1977), which arose out of the tragic plane crash in which baseball star

---

**55.** Liability for negligent performance of an undertaking to perform a duty owed by another to a third person, Restatement (Second) of Torts § 324A(b), is not pleaded by plaintiffs either. In light of our previous discussion, however, *see* text accompanying note 52 *supra*, amended pleadings cannot cure the defects under § 324A(b). Therefore, leave to amend is granted only as to §§ 323 and 324A(a), (c).

Roberto Clemente was killed while taking relief supplies to the victims of the Nicaraguan earthquake of 1972. The district court had granted judgment for the plaintiffs, concluding that the FAA staff in Puerto Rico was negligent in failing to inspect the aircraft in question as they were required to do under internal orders of the FAA's Southern Region. The First Circuit, Coffin, C. J., reversed on the grounds that an internal agency order, without more, does not impose on the government a duty running to members of the public that is enforceable by tort action.

> Not all acts and orders of the United States government are so sovereign that they must be treated as commands which create legal duties or standards, the violation of which involves breaking the law. A considerable part of the government's conduct is in the context of an employer-employee relationship, a relationship which includes reciprocal duties between the government and its staff, but not necessarily a legal duty to the citizenry.

At 1144. Rather said the court, for there to be a legal duty—analogous common law liability must exist in the place where the tort occurred, in this case meaning that the "good Samaritan" requirements of the Restatement must be met.

> No Puerto Rico case alleging a remotely similar basis for liability has been brought to our attention. Moreover, the Restatement of Torts 2d §§ 323 and 324A makes it clear that liability in such a situation must be predicated on one of three grounds: the conduct of the employee actually increased the risk of harm to the damaged firm; the harm to the damaged firm resulted from its reliance on the employee carrying out the inspection as ordered; or there existed a prior duty to inspect owed by the employer to the damaged firm. . . . None of these conditions apply to . . . plaintiffs' claims in the matter before us. . . . Therefore there can be no basis for liability under general principles of tort law and the Federal Tort Claims Act. To hold otherwise would be to interpret every command made as an exercise of discretion by the supervisory or administrative staff of any federal agency as creating a duty of the federal government to the beneficiaries of that command such that the government would be liable to the beneficiary if the command was not carried out. We do not believe the Federal Tort Claims Act was intended to expose the government to such limitless liability and would not so hold unless we were required to. do so by established precedent.

In reaching its decision, the First Circuit incorporated the requirements of reliance or increased risk of harm into the notion of assumption of an undertaking under §§ 323 and 324A, whereas we have followed Pennsylvania law in including them in the causation element. *See* note 51 *supra*. The effect of our emphasis on reliance or increased risk for the causation element, however, is in practical effect the same as the First Circuit's approach. The provisions of §§ 323 and 324A ensure that before a good Samaritan is held liable for negligent performance of his undertaking, he in some positive way must have contributed to the injury, either by increasing risk of harm, §§ 323(a), 324A(a), by interposing himself between another person and the duty that the other person owed to someone else, § 324A(b), *see* text accompanying note 52 *supra*, or by inducing reliance on his undertaking, §§ 323(b), 324A(c). Without such protections, we doubt that the government would undertake to perform what are, in most cases, services beneficial to the public. We do not agree with the proposition that we should extend liability beyond that established by §§ 323 and 324A on the theory that even when the requirements of the Restatement are not met, no inspection at all is better than a negligent one. This "all or nothing" position is correct *only* if the negligence contributes to subsequent injury, and we perceive that the negligence so contributes only when the requirements of the Restatement are met. Otherwise, while the inspections may not have improved matters, neither did they worsen them. On the other hand, in countless other situa-

tions, government OSHA inspections have doubtless helped to prevent serious injury and perhaps death. The confessedly unfortunate failure of the inspections in the cases before us to achieve the congressional goal of preventing employee injury does not lead inexorably to the conclusion that the allegedly negligent inspections were a proximate cause of the injuries (or, alternatively, that the United States breached an enforceable duty it owed to the plaintiffs). When operational governmental negligence contributes to private injury, the government should be held accountable no less than is any one else. When the situation is otherwise, however—when, in other words, proximate causation (or duty) is not present—the point the First Circuit made in *Clemente* is apposite:

> [T]o attempt to expand the relief available to victims and their families through the Federal Tort Claims Act in circumstances similar to those to this case would, we believe, have an unfortunate inhibiting effect on government safety measures. The end result of attaching liability to government attempts at all levels to supplement the safety precautions of private individuals and businesses, even when there is no reliance on the government's assistance, is far more likely to increase the reluctance of the government to involve itself in such matters than it is to install a higher quality of performance in the federal employees assigned to carry such functions out. We do not believe that the expanded role of the federal government in the safety area through such legislation as OSHA indicates an intent of Congress to make the United States a joint insurer of all activity subject to inspection under the statute or others. Nor do we believe that there is any sound policy basis for requiring

that government attempts to protect the public must be accompanied by per se tort liability if they are unsuccessfully carried out.

*Id.* at 1150–1151.

## IV. *Conclusion*

We find, at least tentatively, that we have jurisdiction under the FTCA despite the discretionary function exception. We therefore deny defendant's 12(b)(1) motions without prejudice to its right to reassert them on a fuller record. That record may, at least in part, develop from the 60 day period of discovery that we shall afford to the parties, principally to give plaintiffs opportunity to develop evidence of legal cause (reliance or increased risk of harm),[56] although also to permit them to sharpen their allegations of duty (the extent of the OSHA inspectors' undertakings). Plaintiffs are granted leave to amend their complaints within 75 days, assuming, of course, that they can do so with fidelity to Fed.R. Civ.P. 11.[57] If plaintiffs do not amend, we will dismiss the actions for failure to allege sufficient legal causation, hence to state claims upon which relief can be granted. If, however, plaintiffs do file amended complaints, defendant is granted 20 days after service thereof to answer, to renew its motions to dismiss (under either Rule 12(b)(1) or Rule 12(b)(6)), or to move for summary judgment.

An appropriate order follows.

---

**56.** We note in this regard that it is unlikely that plaintiffs would require extensive discovery on the issue of reliance; either the plaintiffs or their employers relied on the OSHA inspections or they did not. For pleading purposes at least, simple interviews would seem to suffice.

**57.** We, of course, do not suggest that the fate of one case is inextricably tied to the fate of the other. Although the present records made it

appropriate to address both cases in identical fashion and to deal with them in a single opinion and order, discovery may show the two cases to diverge in important factual respects. Thus, it is possible that the facts of one case will accommodate amended pleadings that conform with this opinion, while the facts of the other will not.